15-1133-cv(L)
CBF Indústria De Gusa S/A, et al. v. AMCI Holdings, Inc., et al.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2015

(Argued: March 2, 2016
Final Briefs Submitted: October 5, 2016          Decided: January 18, 2017)

Docket Nos. 15-1133-cv(L), 15-1146-cv(CON)

_____

CBF INDÚSTRIA DE GUSA S/A, DA TERRA SIDERÚRGICA LTDA,
FERGUMAR—FERRO GUSA DO MARANHÃO LTDA, FERGUMINAS
SIDERÚRGICA LTDA, GUSA NORDESTE S/A, SIDEPAR—SIDERÚRGICA DO
PARÁ S/A, SIDERÚRGICA UNIÃO S/A,

*Plaintiffs-Appellants*,

v.

AMCI HOLDINGS, INC., AMERICAN METALS & COAL INTERNATIONAL,
INC., K-M INVESTMENT CORPORATION, PRIME CARBON GMBH,
PRIMETRADE, INC., HANS MENDE, FRITZ KUNDRUN,

*Defendants-Appellees*.[1]

_____

[1] The Clerk of Court is respectfully instructed to amend the official caption in this case to conform to the listing of the parties above.

Before: KEARSE, POOLER, and SACK, *Circuit Judges*.

Appeals from two judgments of the United States District Court for the Southern District of New York (Sweet, *J.*) dismissing both the initial action to enforce and the subsequent action to confirm a foreign arbitral award brought by plaintiffs-appellants CBF Indústria de Gusa S/A, Da Terra Siderúrgica LTDA, Fergumar— Ferro Gusa do Maranhão LTDA, Ferguminas Siderúrgica LTDA, Gusa Nordeste S/A, Sidepar—Siderúrgica do Pará S/A, and Siderúrgica União S/A (collectively, "appellants" or "award-creditors") against defendants-appellees AMCI Holdings, Inc., American Metals & Coal International, Inc., K-M Investment Corporation, Prime Carbon GmbH, Primetrade, Inc., Hans Mende, and Fritz Kundrun (collectively, "appellees").

Appellants brought suit in the United States District Court for the Southern District of New York to enforce a foreign arbitral award against appellees as alter-egos of the then-defunct award-debtor. The district court first dismissed appellants' cause of action to enforce the foreign arbitral award on the basis that the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards and Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §

2

201 *et seq.*, required appellants to seek confirmation of the award prior to enforcement. The district court also dismissed appellants' five causes of action for fraud on the basis of issue preclusion due to prior consideration of certain fraud issues by the arbitral panel. After appellants filed a second proceeding seeking to confirm the foreign arbitral award and filed an amended complaint in the enforcement proceeding, the district court dismissed the action to confirm on the basis that the award-debtor was immune from suit under Federal Rule of Civil Procedure 17(b) and then dismissed the amended action to enforce for failure to confirm the foreign arbitral award.

In No. 15-1133, we hold that the district court both (1) erred in determining that the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards and Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 *et seq.*, require appellants to seek confirmation of a foreign arbitral award before the award may be enforced by a United States District Court and (2) erred in holding that appellants' fraud claims should be dismissed prior to discovery on the ground of issue preclusion as issue preclusion is an equitable doctrine and appellants plausibly allege that appellees engaged in fraud. Accordingly, we

3

vacate the district court's judgment dismissing the action to enforce and remand for further proceedings consistent with this opinion. In No. 15-1146, we hold that the appeal of the judgment dismissing the action to confirm is moot and accordingly dismiss that appeal.

In No. 15-1133, Vacated and Remanded. In 15-1146, Dismissed as Moot.

_____

ADAM K. GRANT, Polsinelli PC (David L. Barrack, *on the brief*), New York, NY, *for Plaintiffs-Appellants*.

KEVIN P. LUCAS, Buchanan Ingersoll & Rooney, PC (Bruce A. Americus, Alexandra P. West, Stuart P. Slotnick, *on the brief*), Pittsburg, PA, *for Defendants-Appellees*.

Peter Aronoff, Benjamin H. Torrance, Assistant United States Attorneys, Of Counsel; Benjamin C. Mizer, Principal Deputy Assistant Attorney General; Sharon Swingle, Attorney, Appellate Staff, Civil Division, Department of Justice; Brian Egan, Legal Adviser, Department of State, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *as amicus curiae in support of Plaintiffs-Appellants*.

4

POOLER, *Circuit Judge*:

Plaintiffs-Appellants CBF Indústria de Gusa S/A, Da Terra Siderúrgica LTDA, Fergumar— Ferro Gusa do Maranhão LTDA, Ferguminas Siderúrgica LTDA, Gusa Nordeste S/A, Sidepar—Siderúrgica do Pará S/A, and Siderúrgica União S/A (collectively, "appellants" or "award-creditors") appeal two judgments of the United States District Court for the Southern District of New York (Sweet, *J.*) dismissing both appellants' initial action to enforce and appellants' subsequent action to confirm a foreign arbitral award against defendants-appellees AMCI Holdings, Inc., American Metals & Coal International, Inc., K-M Investment Corporation, Prime Carbon GmbH, Primetrade, Inc., Hans Mende, and Fritz Kundrun (collectively, "appellees") as alter-egos of the award-debtor.

Appellants brought suit in the United States District Court for the Southern District of New York to enforce a foreign arbitral award against appellees as alter-egos of the then-defunct award-debtor. The district court first dismissed appellants' cause of action to enforce the foreign arbitral award on the basis that the United Nations Convention on the Recognition and Enforcement of

5

Foreign Arbitral Awards and Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 *et seq.*, required appellants to seek confirmation of the foreign arbitral award prior to enforcement. The district court also dismissed appellants' five causes of action for fraud on the basis of issue preclusion[2] due to prior consideration of certain fraud issues by the arbitral panel. After appellants filed a second proceeding seeking to confirm the foreign arbitral award and filed an amended complaint in the enforcement proceeding, the district court dismissed the action to confirm on the basis that the award-debtor was immune from suit under Federal Rule of Civil Procedure 17(b) and then dismissed the amended action to enforce for failure to confirm the foreign arbitral award.

We hold the district court erred (1) in determining that the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards and Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 *et seq.*, require appellants to seek confirmation of a foreign arbitral award before the award may be

---

[2] The doctrine of issue preclusion is sometimes called "collateral estoppel," but as the Supreme Court has repeatedly noted, "'issue preclusion' is the more descriptive term." *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 365 n.1 (2016) (citing *Yeager v. United States*, 557 U.S. 110, 120 n.4). Following the Supreme Court's suggestion, we use the term "issue preclusion" here.

enforced by a United States District Court and (2) in holding that appellants' fraud claims should be dismissed prior to discovery on the ground of issue preclusion as issue preclusion is an equitable doctrine and appellants plausibly allege that appellees engaged in fraud. Accordingly, in No. 15-1133, we vacate the district court's judgement dismissing the action to enforce and remand for further proceedings consistent with this opinion; in 15-1146, we find the appeal of the district court's order in the action to confirm is moot and dismiss the appeal.

## BACKGROUND

### I. The Parties

Appellants are a group of foreign companies organized under the laws of, and with their offices located in, Brazil. They produce and supply "pig iron," which is a type of "intermediate metal made by smelting iron ore with high-carbon fuel." App'x at 789 ¶ 27. Pig iron can then be further refined to become steel or wrought iron.

Appellees are a group of interrelated companies (collectively, the "corporate appellees") and two individuals, Hans Mende and Fritz Kundrun

7

(collectively, the "individual appellees"). According to appellants, the individual appellees financially control, directly or indirectly, the corporate appellees.

## II. Allegations in the Amended Complaint

As this is an appeal taken from a decision on a motion to dismiss, the facts are largely drawn from the amended complaint and are accepted as true for the purposes of this appeal. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Beginning in the mid-1990s, appellants sold pig iron to a Swiss company called Primetrade AG. Some portion of that pig iron was then supplied to Primetrade USA which, appellants allege, together with Primetrade AG, "operated as one company" at all relevant times. App'x at 790 ¶ 30.[3] On or about February 28, 2004, a bulk carrier transporting cargo for Primetrade AG exploded off the coast of Colombia, causing the death of the master and five crew members. In April 2005, Primetrade AG transferred its assets, including its agreements with appellants, to Steel Base Trade, AG ("SBT"), a Swiss company,

---

[3] Appellees make special note that the relevant contracts called for delivery in Brazil, and none called for delivery or performance in the United States, "much less New York." Appellees' Br. at 6-7 & n.5.

which "began operating with the same officers and directors as Primetrade AG and at the same offices." App'x at 790 ¶ 32. The transfer to SBT was apparently due to the fact that Primetrade AG garnered negative publicity following litigation arising out of the ship explosion. **[JA 41]** Silvio Moreira, a representative of Primetrade AG in Brazil, informed two of the appellants that "the business would be the same, just under a different name." App'x at 790 ¶ 32.

On or about October 5, 2007, AMCI International GmbH ("AMCI International"), a company owned and controlled by the individual appellees, purchased SBT and its U.S. subsidiary, Primetrade USA. In 2008, appellants and SBT entered into ten separate contracts for the sale and purchase of 103,500 metric tons of pig iron to SBT for more than $76 million (the "Contracts"). Only appellants and SBT are signatories of the Contracts; none of the appellees are signatories. Appellants claim four of the ten Contracts provided for delivery of pig iron in the United States. The delivery dates were set from April 2008 through December 1, 2008.

Each of the Contracts contained the following identical arbitration provision:

> All disputes arising in connection with the present contract shall be finally settled under the rules of Conciliation and Arbitration of the International Chamber of Commerce, Paris, by one or more arbiter, appointed in accordance with said rules.

App'x at 72, 78, 84, 90, 96, 102, 109, 116, 123, 130, 792. The Contracts did not provide that they were entered into on behalf of any other party or specify that they are binding on successors-in-interest or assigns.

Initially, in accordance with the Contracts, SBT purchased 33,056 metric tons of pig iron. Subsequently, however, SBT ceased purchasing pig iron from appellants as required by the Contracts and, by October 2008, SBT was in default of the Contracts. Indeed, in 2008, as the global economy declined, the so-called "commodities bubble" burst, causing many commodities to drop in price by more than a third. *See, e.g.*, Clifford Krauss, *Commodity Prices Tumble*, N.Y. Times, Oct. 13, 2008, http://www.nytimes.com/2008/10/14/business/ economy/14commodities.html (stating that "[m]etals, like aluminum, copper, and nickel have declined by a third or more."). Soon thereafter, appellants contacted SBT regarding its non-compliance with the Contracts and, on

November 20, 2008, SBT representative Dominic Sigrist responded via e-mail, stating:

> You know our group and it is not our style to walk away from obligations. . . . We will need a long time to work this out together. My message to your group is: we are not walking away!!!

App'x at 792 ¶ 42. Appellants allege this was a false representation made in furtherance of Mende and Kundrun's fraudulent conveyance scheme, which involved selling SBT's assets to a separate entity—a shell company owned by Mende and Kundrun. Despite SBT's statement that it would not walk away from its obligations, appellants allege they learned through publicly available shipping records that SBT had been purchasing pig iron from other sources.

On September 11, 2009, appellants sent a written notice to SBT stating amounts due from SBT under the Contracts and proposing negotiation prior to submitting the contract breach to arbitration before the International Chamber of Commerce, Paris (the "ICC Paris"). SBT allegedly asked for some time to evaluate the Contracts and respond to the offer to negotiate. Appellants allege, however, that this was simply a ruse to buy time to allow its alter-egos,

11

appellees, to "engage in a scheme to leave SBT assetless and unable to pay its some of creditors, including [appellants]." App'x at 793 ¶ 45.

### III. Arbitration Proceedings, the Transfer Agreement, and SBT's Bankruptcy

When SBT ultimately responded but failed to either provide a settlement proposal or provide an indication that it would perform the Contracts, appellants filed a request for arbitration in accordance with the arbitration clause of the Contracts with the ICC Paris on November 16, 2009. Soon thereafter, SBT requested an extension of time from the ICC Paris until February 15, 2010 to answer the request for arbitration. The ICC Paris granted an extension until January 27, 2010. During this period, appellants allege that SBT, at Mende and Kundrun's direction, formulated and enacted "their [fraudulent] scheme to transfer all of SBT's assets to a preexisting shell company owned by Mende and Kundrun" on December 23, 2009. App'x at 793 ¶ 48. For example, appellants learned through publicly available records that a Swiss entity named Prime Carbon GmbH ("Prime Carbon") had begun making significant purchases of pig iron. On January 15, 2010, appellants sent a letter to the ICC Paris suggesting that SBT appeared to be "transferring its business operations and assets to Prime

12

Carbon[.]" App'x at 794 ¶ 50. Appellants had discovered that: (a) Prime Carbon had the same address as SBT's parent company AMCI International; (b) Mende was the President of the Board of Directors of Prime Carbon; (c) former directors of SBT had become directors of Prime Carbon; and (d) SBT's website was no longer available. Ten days later, SBT responded by stating:

> [SBT] does not try to evade from its obligations[.]
>
> It is true that the website www.steelbasetrade.com was shut down at the beginning of January 2010[.] The reason is that [SBT] first has to analyze [its] position regarding pending or imminent claims for damages from purchasers as well as against suppliers as well as [its] financial situation[.] Therefore, [SBT] has at least temporarily suspended [its] business activities. Please note, however, [SBT] is still existing and has not resolved to be dissolved and liquidated.

App'x at 794 ¶ 51. According to appellants, this letter represents an additional intentional misrepresentation made by appellees to both appellants and the ICC Paris in order for the appellees to "buy time" while they "effectuate[d] their plan to make SBT an assetless and judgment proof company." Appellants' Br. at 10.

Indeed, on December 27, 2009, around one month before SBT submitted its answer to appellants' Request for Arbitration and two weeks before SBT sent its letter to the ICC Paris stating it "ha[d] not resolved to be dissolved and

13

liquidated[,]" appellants allege SBT entered into a transfer agreement with Prime Carbon. *See CBF Indústria de Gusa S/A/ v. AMCI Holdings, Inc.*, No. 13 Civ. 2581, 2015 WL 1190137, at *4 (S.D.N.Y. Mar. 16, 2015) (hereinafter "Enforcement Decision"). Under this transfer agreement, designated as a "single entity succession" by the terms of the agreement, Prime Carbon became SBT's successor in interest. SBT transferred nearly all of its assets, valued at approximately $126 million, along with liabilities of approximately $130 million to Prime Carbon in exchange for $1. App'x at 795-96 ¶¶ 58-59. The transferred assets included SBT's ownership stake in Primetrade USA (its main asset), shares of an Aruba LLC, insurance policies and physical assets, and bank lines. SBT's sole remaining asset after the transfer was a few thousand Swiss francs ("CHF"). SBT also retained approximately $50 million in liability to appellants and $4.5 million in liability to another creditor, Progress Rail. Appellants describe the transfer agreement as a "turn-key operation" so that Prime Carbon could "seamlessly assume SBT's place in the pig iron market without any contractual obligations to [a]ppellants." Appellants' Br. at 11 (internal quotation marks omitted).

14

On January 18, 2010, SBT sent letters to a variety of its pig iron suppliers notifying them that

> (i) as of November 30, 2009, SBT had transferred all Goods and the respective title of the Goods to Prime Carbon; (ii) Prime Carbon was the new and sole owner of the Goods; (iii) Prime Carbon assumes all rights with respect to the transferred Goods; and (iv) Prime Carbon is willing to enter in[to] all contracts between your company and [SBT] and to perform under the same conditions.

App'x at 794-95 ¶ 53 (internal quotation marks omitted). Further, the letters advised pig iron suppliers "to act from the time being only on [the] instruction of Prime Carbon." App'x at 795 ¶ 54. According to appellants, "SBT, at Mende's and Kundrun's direction, used the delay granted by the ICC Paris to effectuate their plan to transfer SBT's assets to a new company ultimately owned by them." Appellants' Br. at 12.

Following the transfer agreement, Prime Carbon (a) had at least five of the same directors as SBT; (b) assumed ten of SBT's employment contracts; (c) appointed Mende to serve as the President of its Board of Directors; and (d) had, at all times, either the same address as SBT or the same address as AMCI International. The boards of SBT and Prime Carbon formally approved the transfer agreement on January 27, 2010, just two days after SBT had informed

15

ICC Paris that SBT "does not try to evade from its obligations" and that SBT "is still existing and has not resolved to be dissolved and liquidated," App'x at 794 ¶ 51, and the same day SBT filed its answer to appellant's Request for Arbitration, App'x at 797 ¶ 65.

On April 27, 2010, SBT mysteriously transferred 15,000 CHF to Prime Carbon. Afterward, SBT was left with only 7,000 CHF in assets. The next day, April 28, 2010, SBT filed for bankruptcy in Switzerland before the Cantonal Court of Zug. Appellants note that, despite having little to no assets following the transfer agreement, SBT waited four months to file for bankruptcy. Appellants also contend that the transfer of 15,000 CHF to Prime Carbon on April 27, 2010 was an intentional act designed to make it impossible for SBT's bankruptcy administrator to participate in the arbitration on SBT's behalf. Appellants, however, admit that "none of SBT's records provide a contemporaneous explanation" for the transfer. Appellants' Br. at 13.

SBT's bankruptcy administrator thereafter sought a stay of the arbitration proceedings pending before the ICC Paris on June 18, 2010. The ICC Paris did not initially rule on the request.

16

## IV.    The Arbitration Proceedings

On June 23, 2010, after appellants became aware of the transfer agreement and after they had made several requests to ICC Paris to take action with regards to SBT and the assets transferred to Prime Carbon during the arbitration proceedings, appellants requested that the ICC Paris grant appellants interim relief to allow appellants to seize up to approximately $42 million of SBT's. In their petition, appellants alleged wrongful asset transfers and requested the ICC Paris grant them relief allowing them to seize assets held by SBT or held in the name of Prime Carbon. Following a hearing, the ICC Paris ordered appellants to specify the interim relief they sought from SBT. Appellants submitted a petition for interim relief on July 2, 2010, and sought an order for SBT to post a guarantee and to provide documents and information regarding its company (including its shareholders, its directors, its assets, and its liabilities). In that request and related correspondence, appellants specifically requested that the ICC Paris "[r]ecognize the existence of fraudulent acts" as a basis upon which appellants might reach the assets of related third parties, "recognize as illegal the fraud perpetrated by [SBT], which shall then be held liable, permitting [appellants] to

17

pursue [their] credits against [SBT's] shareholders and managers, by application of the disregard doctrine[,]" "recognize these acts taken in the course of the procedure as frauds[,]" and "decide upon the interim measures which are necessary to make an upcoming award effective." App'x at 151 ¶¶ 25-26, 155 ¶¶ 35-36 (internal quotation marks omitted). Appellants also asserted that they were "pursuing a reasonable relief by means of having their credit duly recognized, as well as the fraud carried out by [SBT] in the course of the procedure, so that they c[ould] pierce the corporate veil and make [SBT's] shareholders, directors[,] and affiliated companies liable for the losses caused to [appellants.]" App'x at 154 ¶ 33.

On September 21, 2010, the ICC Paris held a hearing regarding whether SBT was transferring its assets. SBT neither attended the hearing nor asked for the hearing to be postponed. Thereafter, the ICC Paris sent questions to all parties on September 27, 2010; these questions included inquiries into whether SBT had "transferred goods and respective titles of goods to Prime Carbon AG or to any other company after being notified of the Request for Arbitration" and whether SBT "sold, donated[,] or transferred assets, receivables[,] or rights to

18

third parties after the date [SBT] w[as] notified of the instauration of th[e] arbitration procedure" before the ICC Paris. App'x at 151-52 ¶ 28. SBT did not provide any response and also did not respond to the ICC Paris's order to "provide information of which assets, receivables[,] and rights have been sold, donated[,] or somehow transferred to third parties after the date they were notified of the instauration of th[e] arbitration procedure." App'x at 592. After considering these allegations, the ICC Paris deferred decision until the merits phase of the arbitration.

As the ICC Paris did not initially rule on SBT's bankruptcy administrator's seeking of a stay of the arbitration proceedings in June 2010, the administrator renewed his request for a stay on December 15, 2010. On March 29, 2011, the administrator informed the ICC Paris that he had determined that SBT had insufficient funds to participate in the arbitration and that the estate and SBT's creditors did not wish to defend the claims before the ICC Paris. The bankruptcy administrator therefore admitted the claims against SBT as well as the damages sought by appellants (51,756,269.75 CHF).

On November 9, 2011, the ICC Paris rendered an arbitral award (the "award" or "foreign arbitral award") in favor of appellants for $48,053,462.16 plus interest, and granted appellants arbitration costs and legal fees in the amount of $360,000. The ICC Paris did not grant appellants' requested relief to reach Prime Carbon or any other third parties, shareholders, or directors, holding that appellants "did not introduce sufficient evidence in the present proceedings to demonstrate the existence of fraud in the bankruptcy proceedings." Enforcement Decision, 2015 WL 1190137, at *6 (internal quotation marks, brackets, and citation omitted).

**V.     The Action in Brazilian Courts**

Concurrent with its requests for interim relief from the ICC Paris, appellants also took additional actions in an effort to prevent SBT's attempts to flout its contractual obligations. In particular, appellants sought an order in the Judicial Body of the State of Rio de Janeiro, Second District Court of Rio de Janeiro (the "Brazilian District Court"), against both SBT and Prime Carbon to prevent the departure of pig iron from Brazilian ports that had been purchased

20

by Prime Carbon during the pendency of the ICC Paris arbitration. On March 22, 2010, the Brazilian District Court granted the preliminary order, finding that:

> "Postponing" the adoption of the measures (requested by [appellants]) can "realistically" cause them a serious, irreparable or hardly reparable damage, also taking into account the "uncertainty" regarding the current economic situation of [SBT and Prime Carbon], considering the "fraud" that might have been perpetrated in the case at stake.

App'x at 798 ¶ 73. SBT and Prime Carbon appealed the Brazilian District Court's order to the Court of Justice, Thirteenth District Court of Rio de Janeiro (the "Brazilian Appeals Court"). On March 31, 2010, the Brazilian Appeals Court upheld the Brazilian District Court's order because "it [wa]s certain that [SBT and Prime Carbon] d[id] not provide evidence to 'prove' that they have sufficient 'means' for 'in theory' honoring the mentioned debt (that appears to be 'partly' acknowledged)." App'x at 798 ¶ 74. During the week the appeal was pending, however, Prime Carbon left port with the pig iron cargo and appellants were thereafter unable to secure relief in the Brazilian action.

## VI.    Appellants' Attempts to Collect on the Arbitral Award

On January 24, 2012, the SBT bankruptcy administrator issued a final report and, on January 27, 2012, SBT's bankruptcy was declared closed. Because

21

SBT had transferred almost all of its assets to Prime Carbon, appellants were unable to enforce their award from the ICC Paris against SBT. When appellants sent notices to SBT-related companies, most did not reply and those that replied denied involvement with SBT. Appellants allege they were also unable to pursue claims against Prime Carbon because appellees had transferred Prime Carbon's ownership stake in Primetrade USA to AMCI Holdings, Inc., a United States company under the ownership of Mende and Kundrun.

## VII. The Enforcement Action

On April 18, 2013, appellants filed an action to enforce their foreign arbitral award in the district court for the Southern District of New York, seeking to enforce the award against SBT's "alter egos" and "successor[s]-in-interest" as well as to recover on state law fraud claims (the "Enforcement Action"). App'x at 37. On July 30, 2013, appellees filed a motion to dismiss the Enforcement Action on the grounds that, among other things, forum in the United States was improper (forum non conveniens), that the action was an improper effort to modify the award, and that appellants were precluded from asserting the state law fraud claims because their fraud claims had been denied by the ICC Paris.

22

Appellants assert that while briefing was "ongoing" in the Enforcement Action, unbeknownst to appellants, SBT was deleted from the Swiss Commercial Register on September 30, 2013. Appellants' Br. at 19 (citing App'x at 1249 & n.6). Appellants also allege that appellees never disclosed this fact to the district court in their reply brief or in any of their other motions in the Enforcement Action.

On April 9, 2014 and again on March 16, 2015,[4] the district court dismissed the Enforcement Action, holding that appellants could enforce the award only after the award was confirmed in Switzerland or another court of competent jurisdiction, and dismissed the state law fraud claims on the basis that appellants were precluded from asserting them. Enforcement Decision, 2015 WL 1190137, at *1, *8-*9 (dismissing enforcement action); *CBF Indústria de Gusa S/A/ v. AMCI Holdings, Inc.*, 14 F. Supp. 3d 463, 473-79 (S.D.N.Y. 2014) (hereinafter "Initial Order") (dismissing enforcement claim for failure to file confirmation action and dismissing fraud claims). The district court held that under *Orion Shipping &*

---

[4] The district court initially granted appellants leave to amend their complaint. *CBF Indústria de Gusa S/A/ v. AMCI Holdings, Inc.*, 14 F. Supp. 3d 463, 480 (S.D.N.Y. 2014) (hereinafter "Initial Order"). After appellants did so, however, the district court again granted appellees' motion to dismiss. For the sake of brevity, we will discuss the district court's reasoning as outlined in both decisions together.

23

*Trading Co., Inc. v. E. States Petroleum Corp.*, 312 F.2d 299, 301 (2d Cir.), *cert. denied*, 373 U.S. 949 (1963), appellants could not pursue enforcement of an arbitral award under the Convention for the Enforcement and Recognition of Foreign Arbitral Awards (the "New York Convention") and its implementing legislation, Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 *et seq.*, without first confirming the award. Enforcement Decision, 2015 WL 1190137, at *8-*9; Initial Order, 14 F. Supp. 3d at 476-79. The district court held that *Orion* required a two-step process by which appellants were required to confirm the award prior to seeking enforcement of that award. Initial Order, 14 F. Supp. 3d at 478-79. Appellants had proposed a "carve-out" whereby confirmation was not required when confirmation was made impossible by appellees' alleged fraudulent acts. *See* Enforcement Decision, 2015 WL 1190137, at *8. Appellants argued in support that the confirmation "'prerequisite should not apply where alter ego defendants, through their own intentional wrongdoing, foreclosed any opportunity to confirm the award." *Id.* (internal quotation marks and citation omitted). The district court rejected appellants' argument, reasoning that this proposed exception would "undermine 'the twin goals of arbitration, namely, settling

24

disputes efficiently and avoiding long and expensive litigation.'" *Id.* at *9 (quoting *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005)).

The district court also dismissed appellants' five causes of action for fraud on the basis that the claims sought "a remedy previously sought by [appellants] in the ICC [a]rbitration" and therefore were barred under a theory of issue preclusion. Initial Order, 14 F. Supp. 3d at 480. The district court observed that, as it sat in secondary jurisdiction with regard to appellants' arbitral award, it could not modify that award either during the enforcement of the award or pursuant to appellants' fraud-based causes of action. Enforcement Decision, 2015 WL 1190137, at *9 (citing Initial Order, 14 F. Supp. 3d at 480); Initial Order, 14 F. Supp. 3d at 480.

**VIII. The Confirmation Action**

In response to the district court's initial ruling that *Orion* required appellants to confirm their award prior to seeking its enforcement, appellants initiated an action on April 29, 2014 to confirm the arbitral award in the same district court (the "Confirmation Action"). As a legal entity, however, SBT was

25

effectively a nullity after it was deleted from the Swiss Commercial Register. *See* Peter Forstmoser et al., *Swiss Company Law* § 56, N 153 (1996) ("*A practical effect* is, however, had by the striking of the corporation from the register, as this means the corporation is *no longer able to act externally*: it is no longer able to . . . be sued or have debt collection proceedings filed against it."(italics in original)). As a result, the district court held that, under Rule 17(b) of the Federal Rules of Civil Procedure, SBT lacked capacity to be sued because it was no longer a corporate entity according to Swiss law. *CBF Indústria de Gusa S/A v. Steel Base Trade AG*, No. 14 Civ. 3034, 2015 WL 1191269, at *3 (S.D.N.Y. Mar. 16, 2015) (hereinafter "Confirmation Decision").

The district court also held that appellees were not judicially estopped from asserting SBT's lack of capacity as a defense. Appellants had argued that "[appellees] asserted repeatedly that Switzerland and France provided adequate forums for [appellants'] claims [against SBT] and, indeed, were the proper forums for this action[,]" thereby estopping appellees from arguing SBT lacked capacity to be sued in any fora. Confirmation Decision, 2015 WL 1191269, at *3 (internal quotation marks omitted). The district court noted that, under Second

26

Circuit precedent, a party may be judicially estopped from asserting a position if "(1) the party took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment." *Id.* (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 80 (2d Cir. 2001) and citing *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6-8 (2d Cir. 1999)). The district court noted that "[t]he purposes of the doctrine are to preserve the sanctity of the oath and to protect judicial integrity by avoiding the risk of inconsistent results in two proceedings." *Id.* (quoting *Mitchell*, 190 F.3d at 6). But the district court held that, because the Enforcement Action was not dismissed on the grounds of forum non conveniens, the second prong of *Holtz* did not apply and appellees were therefore not judicially estopped from making the argument that SBT presently lacked capacity to be sued. *Id.* at *4.

**IX.    Appeal**

Appellants timely filed their appeals from both the Enforcement Decision (No. 15-1133) and the Confirmation Decision (No. 15-1146). In their consolidated appeals, appellants argue, in relevant part, that: (1) the district court erred in holding that *Orion Shipping & Trading Co.*, 312 F.2d at 300-01, required appellants

27

to confirm their foreign arbitral award prior to enforcement; (2) the district court erred in dismissing appellants' fraud claims on the basis of issue preclusion; and (3) the district court erred in determining that equitable estoppel did not preclude appellees from using SBT's immunity from suit as a basis for dismissing the Confirmation Action.

Appellees contest each of appellants' arguments and further argue in response that this court should affirm the district court's dismissal of appellants' Enforcement Action and Confirmation Action on the alternative grounds of forum non conveniens and international comity.

## DISCUSSION

**I. The District Court Erred in Holding Appellants were Required to Confirm their Foreign Arbitral Award Prior to Enforcement**

### a. Standard of Review

This court "review[s] a district court's legal interpretations of the New York Convention as well as its contract interpretation *de novo*; findings of fact are reviewed for clear error." *VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 325 (2d Cir. 2013) (citations omitted).

28

### b. Analysis

This action arises under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517. The United States acceded to the New York Convention on September 30, 1970, and it entered into force in the United States on December 29, 1970. Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517 (hereinafter "N.Y. Convention").

The New York Convention only applies to "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought" and to "arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought." N.Y. Convention, art. I(1). According to the Restatement (Third) of the U.S. Law of International Commercial Arbitration, an arbitral award is "made" in the country of the "arbitral seat," which is "the jurisdiction designated by the parties or by an entity empowered to do so on their behalf to be the juridical home of the arbitration." Restatement (Third) of the U.S. Law of Int'l Commercial Arbitration §1-1 (s), (aa) (Am. Law

29

Inst., Tentative Draft No. 2, 2012). Thus, the New York Convention applies to arbitral awards "made" in a foreign country that a party seeks to enforce in the United States (known as foreign arbitral awards), to arbitral awards "made" in the United States that a party seeks to enforce in a different country, and to nondomestic arbitral awards that a party seeks to enforce in the United States. *See, e.g.*, Restatement (Third) of the U.S. Law of Int'l Commercial Arbitration §1-1 (i), (k), (o) (Am. Law Inst., Tentative Draft No. 2, 2012).

Here, the parties set the seat of the arbitration as the ICC Paris in Paris, France. The arbitral award which appellants seek to enforce was rendered by the ICC Paris under French law. Initial Order, 14 F. Supp. 3d at 474. The parties are thus correct that the New York Convention governs this case as a matter of international arbitration law. Since the arbitral award was made in France while recognition and enforcement is sought in the Southern District of New York, this litigation presents a classic case of a foreign arbitral award.

Under the New York Convention, the country in which the award is made "is said to have *primary* jurisdiction over the arbitration award." *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 115

30

n.1 (2d Cir. 2007) (internal quotation marks omitted) (hereinafter "*Karaha Bodas*

*2d Cir.*"). "The [New York] Convention specifically contemplates that the state in

which, or under the law of which, [an] award is made, will be free to set aside or

modify an award in accordance with its domestic arbitral law and its full

panoply of express and implied grounds for relief." *Yusuf Ahmed Alghanim &*

*Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997) (citing N.Y. Convention,

art. V(1)(e)). Here, that country is France because the parties agreed to arbitrate

before the ICC Paris. "All other signatory States are *secondary* jurisdictions, in

which parties can only contest whether that State should enforce the arbitral

award." *Karaha Bodas 2d Cir.*, 500 F.3d at 115 n.1 (citation omitted). "[C]ourts in

countries of *secondary* jurisdiction may refuse enforcement only on the limited

grounds specified in Article V" of the New York Convention. *Id.* (citation

omitted); *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 23 ("[T]he [New York]

Convention is equally clear that when an action for enforcement is brought in a

foreign state, the state may refuse to enforce the award only on the grounds

explicitly set forth in Article V of the [New York] Convention."). The district

court here sits in secondary jurisdiction with respect to the foreign arbitral award at issue. Initial Order, 14 F. Supp. 3d at 474.

Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 *et seq.*, implements the United States' obligations under the New York Convention. *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). Section 203 provides that original jurisdiction for "[a]n action or proceeding falling under the [New York] Convention" lies in the United States federal district courts. 9 U.S.C. § 203. Under Section 202, actions or proceedings that "fall[] under the [New York] Convention" include "arbitration agreement[s] or arbitral award[s] arising out of a legal relationship, whether contractual or not, which is considered as commercial" between any parties, *unless* both parties are citizens of the United States *and* "that relationship involves [neither] property located abroad, [nor] envisages performance or enforcement abroad, [n]or has some other reasonable relation with one or more foreign states." 9 U.S.C. § 202. As the instant case involves non-U.S. citizens—all of the appellants, for example, are Brazilian corporate entities—this case properly falls under Chapter 2 of the FAA as well as under the New York Convention.

32

"The goal of the [New York] Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk*, 417 U.S. at 520 n. 15 (citations omitted). Thus, both the New York Convention and its implementing legislation in Chapter 2 of the FAA "envision a single-step process for reducing a foreign arbitral award to a domestic judgment." Amicus Curiae Memorandum Br. at 6.

Under the New York Convention, this process of reducing a foreign arbitral award to a judgment is referred to as "recognition and enforcement." N.Y. Convention, arts. III, IV, V. "Recognition" is the determination that an arbitral award is entitled to preclusive effect; "Enforcement" is the reduction to a judgment of a foreign arbitral award (as contrasted with a nondomestic arbitral award, discussed below). Restatement (Third) of the U.S. Law of Int'l Commercial Arbitration §1-1(l), (z) (Am. Law Inst., Tentative Draft No. 2, 2012).

33

Recognition and enforcement occur together, as one process, under the New York Convention. N.Y. Convention, arts. III, IV, V.

Chapter 2 of the FAA implements this scheme through Section 207, which provides that any party may, "[w]ithin three years after an arbitral award . . . is made, . . . apply to any court having jurisdiction under this chapter for an order confirming the award." 9 U.S.C. § 207. Additionally, Chapter 2 of the FAA provides that "[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention" at Article V. 9 U.S.C. § 207. Read in context with the New York Convention, it is evident that the term "confirm" as used in Section 207[5] is the equivalent of "recognition and enforcement" as used in the New York Convention for the purposes of foreign arbitral awards. As the

---

[5] Section 207's use of the term "confirm" may be one source of the confusion we now attempt to rectify. *See, e.g.*, *VRG Linhas*, 717 F.3d at 325 (noting first that "a party may petition a United States district court to *confirm* a foreign arbitral award that the party received within the previous three years" before explaining that "the [New York] Convention allows courts to refuse to *recognize* a foreign arbitral award" in certain circumstances (emphases added)); *Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Rep.*, 582 F.3d 393, 396-97 (2d Cir. 2009) (using the terms "confirm" and "confirmation" to describe the process of enforcement of a foreign arbitral award).

United States as *amicus curiae*[6] explained, "the 'confirmation' proceeding under Chapter Two of the FAA fulfills the United States' obligation under the [New York] Convention to provide procedures for 'recognition and enforcement' of [New York] Convention arbitral awards." Amicus Curiae Memorandum Br. at 7. A single proceeding, therefore, "facilitate[s] the enforcement of arbitration awards by enabling parties to enforce them in third countries without first having to obtain either confirmation of such awards or leave to enforce them from a court in the country of the arbitral situs." *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 366-67 (5th Cir. 2003) (footnote omitted).

This, in fact, was the entire purpose of the New York Convention, which "succeeded and replaced the Convention on the Execution of Foreign Arbitral Awards ('Geneva Convention'), Sept. 26, 1927, 92 L.N.T.S. 301." *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 22. "The primary defect of the Geneva Convention was that it required an award first to be recognized in the rendering state before

---

[6] Because the United States is a party to the New York Convention and participated in its negotiation, the government's "interpretation of [the] treaty is entitled to great weight." *Medellín v. Texas*, 552 U.S. 491, 513 (2008) (internal quotation marks and citations omitted).

it could be enforced abroad[.]" *Id.* (citation omitted). This was known as the "double *exequatur*" requirement, and the New York Convention did away with it "by eradicating the requirement that a court in the rendering state recognize an award before it could be taken and enforced abroad." *Id.* (citations omitted) (stating that the New York Convention "intentionally liberalized procedures for enforcing foreign arbitral awards" (internal quotation marks and citations omitted)).

For the sake of completeness and in an effort to dispel confusion in this area, we will briefly discuss the components of and process for a nondomestic arbitral award.

As noted above, in addition to covering foreign arbitral awards (awards made in one country for which enforcement is sought in another, such as the arbitral award at issue here), the New York Convention also applies to "arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought." N.Y. Convention, art. I(1). Under Second Circuit precedent, a nondomestic arbitral award is an award that is "made" in the United States because the parties agreed to arbitrate before an arbitrator in the

United States, but which nonetheless falls under the New York Convention and Chapter 2 of the FAA for one of two reasons: (1) it was "made within the legal framework of another country, e.g., pronounced in accordance with foreign law[,]" *Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2d Cir. 1983), or (2) it was decided under the laws of the United States but involves either entities that are not U.S. citizens or, even if only U.S. citizens are involved, also involves "property located abroad, [or] envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." 9 U.S.C. § 202; *see Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 18-19 (noting "[t]he Seventh Circuit similarly has interpreted [Section] 202 to mean that any commercial arbitral agreement, unless it is between two United States citizens, involves property located in the United States, and has no reasonable relationship with one or more foreign states, falls under the [New York] Convention" (internal quotation marks and citations omitted)). These types of awards are sometimes referred to as *Bergesen* awards or U.S. Convention awards; we will use the term nondomestic arbitral award for the sake of precision.

37

As a nondomestic arbitral award is made in the United States, a federal district court sits in *primary* jurisdiction over a nondomestic arbitral award. *See Karaha Bodas 2d Cir.*, 500 F.3d at 115 n.1. The process by which a nondomestic arbitral award is reduced to a judgment of the court by a federal court under its *primary* jurisdiction is called "confirmation." Restatement (Third) of the U.S. Law of Int'l Commercial Arbitration §1-1(g) (Am. Law Inst., Tentative Draft No. 2, 2012). Under its primary jurisdiction in a confirmation proceeding, the district court is, as this court has recognized, "free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief." *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 23 (citing N.Y. Convention, art. V(1)(e)); *see also id.* ("The confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." (internal quotation marks, brackets, and citation omitted)). Once a nondomestic arbitral award has been confirmed, it becomes a court judgment and is enforceable and entitled to full faith and credit in any other court in the United States. *See* U.S. Const. art IV, § 1; *see also*

*Hatzlachh Supply, Inc. v. Moishe's Elecs. Inc.*, 848 F. Supp. 25, 28 (S.D.N.Y. 1994) (noting domestic arbitral award must be confirmed before it is enforceable).

Accordingly, the district court erred in holding that appellants were required to confirm their foreign arbitral award before they would be allowed to enforce it. The New York Convention and Chapter 2 of the FAA require only that the award-creditor of a foreign arbitral award file one action in a federal district court to enforce the foreign arbitral award against the award-debtor. *See Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 22. *Orion Shipping & Trading Co.*, a pre-New York Convention decision under Chapter 1 of the FAA and involving what would today be considered a nondomestic arbitral award, does not mandate a different result. 312 F.2d at 300-01. Chapter 1 of the FAA, which generally covers domestic arbitral awards that do not fall under the New York Convention, applies to "actions and proceedings brought under" Chapter 2 only "to the extent that [Chapter 1] is not in conflict with [Chapter 2] or the [New York] Convention as ratified by the United States." 9 U.S.C. § 208. To the extent, then, that a confirmation proceeding is required for nondomestic arbitral awards, such

a procedure would be in conflict with the single step procedure mandated by Chapter 2 and the New York Convention for foreign arbitral awards.

None of the other cases the district court cites are to the contrary. Like *Orion Shipping & Trading Co.*, *Productos Merchantiles E Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41 (2d Cir. 1994), *Overseas Private Investment Corp. v. Marine Shipping Corp.*, No. 02 Civ. 475, 2002 WL 31106349 (S.D.N.Y. Sept. 19, 2002), and *Sea Eagle Maritime, Ltd. v. Hanan Int'l Inc.*, No. 84 Civ. 3210, 1985 WL 3828 (S.D.N.Y. Nov. 14, 1985), all involve nondomestic arbitral awards over which the federal district court sits in primary jurisdiction rather than secondary jurisdiction. *See Productos*, 23 F.3d at 43 (arbitration occurred in New York); *Overseas Private Inv.*, 2002 WL 31106349, at *1 (parties agreed to arbitration in Washington, D.C. under the rules of the American Arbitration Association); *Sea Eagle*, 1985 WL 3828, at *1 (noting parties "agreed to arbitration in New York"). On the other hand, one of the cases cited by the district court—*Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 491 (2d Cir. 2002) (hereinafter "*Monde Re*")—did involve a foreign arbitral award. There, however, although the award-creditor had sought confirmation of the

40

foreign award, this circuit never held that such confirmation was a necessary precondition to enforcement of a foreign arbitral award because the circuit never reached the substantive contentions of the parties, instead dismissing the action on an alternative ground. *Id.* at 495.

The confusion regarding whether parties need to confirm a foreign arbitral award is understandable because Section 207 uses the term "confirm" to describe the process by which a district court acts under its secondary jurisdiction to recognize and enforce a foreign arbitral award. 9 U.S.C. § 207; *see, e.g., VRG Linhas*, 717 F.3d at 325 (employing the term "confirm" as it is used in 9 U.S.C. § 207 to describe the process by which the district court sat in secondary jurisdiction over a foreign arbitral award). The Restatement (Third) of the U.S. Law of International Commercial Arbitration indicates that the proper term for the single-step process in which a federal district court engages when it sits in secondary jurisdiction over a foreign arbitral award is "Enforcement," in contrast to the process in which a federal district court engages when it sits in primary jurisdiction over a nondomestic arbitral award, which is called "Confirmation." Restatement (Third) of the U.S. Law of Int'l Commercial Arbitration §1-1(g), (l)

41

(Am. Law Inst., Tentative Draft No. 2, 2012). In order to avoid such confusion in the future, we encourage litigants and district courts alike to take care to specify explicitly the type of arbitral award the district court is evaluating (domestic, nondomestic, or foreign), whether the district court is sitting in primary or secondary jurisdiction, and, accordingly, whether the action seeks confirmation of a domestic or nondomestic arbitral award under the district court's primary jurisdiction or enforcement of a foreign arbitral award under its secondary jurisdiction.

### c. Applicable Law for an Enforcement Action

Here, appellants properly sought to have the district court enforce a foreign arbitral award under its secondary jurisdiction. On remand, therefore, we instruct the district court to evaluate appellants' Enforcement Action, particularly appellants' effort to reach appellees as alter-egos of SBT, under the standards set out in the New York Convention and Chapter 2 of the FAA.

The New York Convention provides that "[r]ecognition and enforcement of [a foreign arbitral] award may be refused . . . only if [the requesting] party furnishes to the competent authority where the recognition and enforcement is

sought, proof that" one of five enumerated conditions has been met. N.Y.

Convention, art. V(1). Here, the "competent authority" is the federal district

court to which the award-creditor has applied for enforcement. *See* 9 U.S.C. § 203.

The five conditions laid out under the New York Convention are:

(*a*) The parties to the [arbitration] agreement referred to in article II [of the New York Convention] were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(*b*) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(*c*) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(*d*) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(*e*) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

43

N.Y. Convention, art. V(1) (italics in original). The burden of proving any one of these five conditions rests with the party challenging the arbitral award, here appellees. *Id.*

The New York Convention also states that the federal district court, as the "competent authority[,]" may refuse to enforce the foreign arbitral award if the court determines that "(*a*) [t]he subject matter of the difference is not capable of settlement by arbitration under the law of [the United States]; or (*b*) [t]he recognition or enforcement of the award would be contrary to the public policy of [the United States]." N.Y. Convention, art. V(2) (italics in original).

The New York Convention additionally provides that a signatory State "shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles." N.Y. Convention, art. III. The New York Convention clarifies that this means that "[t]here shall not be imposed substantially more onerous conditions or higher fees or charges on the recognition or enforcement of arbitral awards to which this Convention applies

44

than are imposed on the recognition or enforcement of domestic arbitral awards." *Id.*

This Court has previously held that the question of whether a non-signatory may have a foreign arbitral judgment enforced against it by a federal district court sitting in secondary jurisdiction falls under the first category by which a federal district court could refuse to enforce a foreign arbitral award of its own volition: "the subject matter of the difference is not capable of settlement by arbitration under the law of the country in which enforcement is sought." *VRG Linhas*, 717 F.3d at 325 (internal quotation marks and citation omitted); *see* N.Y. Convention, art. V(2)(a).

This Court has also explained, based on Supreme Court precedent, that there are three questions involved in determining this issue: (1) whether the federal district court or the arbitrator is to decide question (2); (2) whether "the merits of the dispute" are to be arbitrated or decided by the court—the "question of arbitrability"; and (3) the merits of the dispute. *VRG Linhas*, 717 F.3d at 325 (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)). The second question of "[w]hether a given dispute is arbitrable—and the resulting award

45

enforceable—is [] a question to be decided under United States arbitration law.

So too is the [first] question of *who* shall decide a dispute's arbitrability." *Id.*

(citing *Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 661 (2d Cir. 2005)).

Regarding the first question, we have further explained "questions of arbitrability are to be sent to arbitration if and only if the parties clearly and unmistakably expressed their intention to do so." *Id.* at 325-26 (citing *First Options*, 514 U.S. at 945, and *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). "Thus a court must begin by deciding whether the parties before it clearly and unmistakably committed to arbitrate questions regarding the scope of their arbitration agreement." *Id.* at 326. "If—but only if—the answer is *no*, the court must then proceed to determine on its own whether the parties' dispute falls within the scope of their agreement to arbitrate." *Id.*

"When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944 (citations omitted). Courts, however, "should not assume that the parties intended to arbitrate arbitrability unless there is clear and unmistakable evidence

46

that they did so." *Id.* (internal quotation marks, brackets, and citations omitted).

This standard for the first question differs from the standard applicable to the second question. For the second question, courts look to "general principles of contract law," and will find an agreement to arbitrate when "the totality of the evidence supports an objective intention to agree to arbitrate." *Sarhank Grp.*, 404 F.3d at 662.

Accordingly, on remand, the district court must first consider whether the Contracts, which gave rise to the foreign arbitral award at issue in the instant appeal, provide clear and unmistakable evidence that the parties to the Contracts agreed to have an arbitrator decide whether they decided to arbitrate the question of whether a nonsignatory could be bound to an award under the Contracts. If the district court determines that the parties to the Contracts *did* agree to have an arbitrator decide whether they agreed to arbitrate the question of whether a nonsignatory can be bound, then the district court must refuse to decide the issue. If, on the other hand, the district court determines that the parties to the Contracts did *not* agree to have an arbitrator decide whether they agreed to arbitrate that question, then the district court must, proceeding to the

second question of *First Options*, determine whether, under general principles of contract law, the Contracts state that the question of whether a nonsignatory can be bound is, in fact, to be arbitrated. If the district court determines the Contracts require the question to be arbitrated, then the question must go to the arbitrator. If, however, the district court determines that the question of whether a nonsignatory can be bound was not required to be arbitrated under the Contracts, then the district court must turn to the merits of that question.

In case the district court reaches the merits, a determination on which we express no opinion, we provide the following guidance on the issue, which is not meant to be exhaustive. This Court has previously held that "a nonsignatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency." *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (internal quotation marks and citations omitted). "These principles include (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter-ego; and (5) estoppel." *Smith/ Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir. 1999) (internal quotation marks and citation omitted). Determinations under these

48

principles, especially the veil-piercing/alter-ego principle raised in the instant case, "are often fact specific and differ with the circumstances of each case." *Id.* (internal quotation marks and citation omitted). Nonetheless, courts will apply the veil-piercing/alter-ego theory of liability "in two broad situations: to prevent fraud or other wrong, or where a parent dominates and controls a subsidiary." *Thomson-CSF*, 64 F.3d at 777 (citations omitted).

We leave further legal and factual development of these issues to the district court on remand.

## II. The District Court Erred in Dismissing Appellants' Fraud Claims Under the Doctrine of Issue Preclusion

### a. Standard of Review

"On appeal from a dismissal under [Federal] Rule [of Civil Procedure] 12(b)(1), we review the [district] court's factual findings for clear error and its legal conclusions *de novo.*" *Cortlandt St. Recovery Corp. v. Hellas Telecomms. S.à.r.L.*, 790 F.3d 411, 417 (2d Cir. 2015) (citation omitted). This Court must "accept as true all material allegations [in] the complaint" and "construe the complaint in favor of the complaining party." *Id.* (internal quotation marks and citation omitted). The complaining party "bears the burden of alleging facts that

affirmatively and plausibly suggest that it has standing to sue." *Id.* (internal

quotation marks, brackets, and citation omitted).

We also review "*de novo* a district court's decision to dismiss a complaint

pursuant to [Federal] Rule [of Civil Procedure] 12(b)(6), accepting all factual

allegations as true and drawing all reasonable inferences in the plaintiff's favor."

*Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (citation omitted). "To survive

a 12(b)(6) motion, the complaint must contain factual allegations that plausibly

give rise to an entitlement to relief." *Id.* (citation omitted).

**b. Analysis**

The district court dismissed appellants' five causes of action for fraud on

the basis that these claims sought "a remedy previously sought by [appellants] in

the ICC Arbitration . . . [and] are therefore barred." Initial Order, 14 F. Supp. 3d

at 480 (citations omitted).

We understand the district court's finding to be one of as issue preclusion,

*i.e.*, that appellants, having already had a "full and fair opportunity" to litigate

their fraud claims and having received an unfavorable determination from the

ICC Paris, are not permitted to relitigate the issue in the federal district court in

an attempt to achieve a more favorable outcome. *See Kulak v. City of New York*, 88 F.3d 63, 72 (2d Cir. 1996).

"It is settled law that the doctrine of issue preclusion is applicable to issues resolved by an earlier arbitration." *Khandhar v. Elfenbein*, 943 F.2d 244, 247 (2d Cir. 1991) (internal quotation marks, brackets, and citations omitted). The mere fact, however, that an issue appears to have been resolved by an earlier arbitration does not necessarily mean that issue preclusion applies. "An arbitration decision may effect [issue preclusion] in a later litigation . . . [only] if the proponent can show with clarity and certainty that the same issues were resolved." *Bear, Stearns & Co., Inc. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005) (internal quotation marks and citation omitted).

> [Issue Preclusion] is permissible as to a given issue if[:] (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; [] (4) the resolution of the issue was necessary to support a valid and final judgment on the merits[;] . . . [and (5)] application of the doctrine is fair.

*Id.* (internal quotation marks and citations omitted).

The Second Circuit, applying New York law, has further instructed district courts to consider the following factors in determining whether a party has had a full and fair opportunity to litigate the issue in a prior action:

> the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law[,] and foreseeability of future litigation.

*King v. Fox*, 418 F.3d 121, 130 (2d Cir. 2005) (internal quotation marks and citation omitted).

Because issue preclusion is an equitable doctrine, the Second Circuit and federal courts adhere to the maxim that "[h]e who comes into equity must come with clean hands." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 241 (1933). This principle, known as the "doctrine of unclean hands," is "that the equitable powers of this court can never be exerted [o]n behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abettor of iniquity." *PenneCom B.V. v. Merrill Lynch & Co., Inc.*, 372 F.3d 488, 493 (2d Cir. 2004) (internal quotation marks, brackets, and citations omitted).

52

Here, appellants argue that they were denied a full and fair opportunity to litigate the merits of their fraud claims due to appellees' fraud and misconduct before the ICC Paris. Specifically, appellants claim that appellees misled the ICC Paris as to the extent of the fraud committed by appellees, thereby leading the ICC Paris to issue an unfavorable decision on the issue which appellees now seek to enforce for purposes of issue preclusion.

Appellants' allegations against appellees are very similar to those made in *PenneCom*, 372 F.3d at 491-93. There, PenneCom alleged that Merrill Lynch "devised a fraudulent scheme to dupe the arbitrators" which led to a decision unfavorable to PenneCom regarding the "extent of loss incurred by PenneCom" under the arbitrated contract. *Id.* at 493. The district court determined that collateral estoppel barred PenneCom from relitigating the extent of its loss under the contract. *Id.* at 491. The Second Circuit reversed, holding that "before the court invokes [issue preclusion,] . . . PenneCom must be allowed discovery to collect evidence which might support a finding either that PenneCom was not afforded a full and fair opportunity to prove its loss in the arbitration, or that

53

Merrill Lynch should be precluded by its own (alleged) misconduct from asserting the equitable doctrine of [issue preclusion]." *Id.* at 493.

We find the same outcome is warranted here. Given appellants' assertions of fraud on the part of appellees, assertions we must accept as true at the motion to dismiss stage, *see Crawford*, 796 F.3d at 256, we find the district court's application of the equitable doctrine of issue preclusion was inappropriate. On remand, appellants should be allowed to conduct discovery with respect to the fraud claims. Appellees may be given the opportunity to re-raise the issue preclusion issue after discovery at the district court's discretion.

**III.    The Court Declines to Affirm the Rulings of the District Court on the Alternative Grounds of Forum Non Conveniens and International Comity**

In addition to challenging appellants' affirmative arguments on appeal, appellees also urge this court to affirm the district court's dismissal of appellants' Enforcement Action on the alternative grounds of forum non conveniens and international comity.

"It is well settled that we may affirm [a district court's decision] on any grounds for which there is a record sufficient to permit conclusions of law,

54

including grounds not relied upon by the district court." *In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 157-58 (2d Cir. 2015) (internal quotation marks and citations omitted). We, however, have "discretion to choose not to do so based on prudential factors and concerns." *Id.* at 158 (citing *Bacolitsas v. 86th & 3rd Owner, LLC*, 702 F.3d 673, 681 (2d Cir. 2012)).

We decline to affirm the district court's dismissal on the alternative grounds of forum non conveniens and international comity here. We leave these issues for consideration by the district court in the first instance should appellees choose to raise them again.

We have considered all of appellees' contentions in support of the judgment dismissing the Enforcement Action and have found them to be without merit.

**CONCLUSION**

For the foregoing reasons, we hold that the district court erred in dismissing appellants' Enforcement Action because: (1) appellants are not required to bring an action to confirm their foreign arbitral award before they can seek to enforce it, and (2) appellants' fraud claims are not barred by collateral

estoppel given appellants' allegations that appellees engaged in fraud and misconduct before the ICC Paris. We also hold that the appeal of the district court's dismissal of appellants' Confirmation Action is moot given that confirmation of a foreign arbitral award prior to enforcement is unnecessary under the New York Convention and Chapter 2 of the FAA.[7] Lastly, we decline to affirm the district court's dismissal of appellants' Enforcement Action on the alternative bases of forum non conveniens or international comity. Accordingly, in No. 15-1133, we VACATE the district court's judgment dismissing the Enforcement Action and REMAND for further proceedings consistent with this opinion. In No. 15-1146, we hold that the appeal of the judgment dismissing the Confirmation Action is moot and accordingly DISMISS that appeal.

---

[7] Inasmuch as our decision of the appeal in the Enforcement Action moots the issue of whether the district court should have dismissed the Confirmation Action pursuant to Federal Rule of Civil Procedure 17(b)(2) on the ground that SBT lacks the capacity to be sued because of its removal from the Swiss Commercial Register, *see* Peter Forstmoser et al., *Swiss Company Law* § 56, N 153 (1996) ("*A practical effect* is, however, had by the striking of the corporation from the register, as this means the corporation is *no longer able to act externally*: it is no longer able to . . . be sued or have debt collection proceedings filed against it."), we need not and do not decide the capacity issue.