*Beijing Shougang Mining v. Mongolia*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2020

(Argued: February 18, 2021          Decided: August 26, 2021)

No. 19-4191

_____

BEIJING SHOUGANG MINING INV. CO., LTD., CHINA HEILONGJIANG INT'L ECON. &
TECH. COOP. CORP., QINHUANGDAOSHI QINLONG INT'L INDUS. CO. LTD.,

*Petitioners-Appellants,*

-v.-

MONGOLIA,

*Respondent-Appellee.*

_____

Before:     LIVINGSTON, *Chief Judge*, CHIN, and BIANCO, *Circuit Judges*.

Beijing Shougang Mining Investment Company, Ltd., China Heilongjiang International Economic & Technical Cooperative Corporation, and Qinhuangdaoshi Qinlong International Industrial Company Ltd. (collectively, "Petitioners-Appellants") appeal from the November 25, 2019 order of the U.S. District Court for the Southern District of New York (Ramos, *J.*) denying their petition to set aside an arbitral award issued by an *ad hoc* arbitral tribunal constituted under a bilateral investment treaty between Mongolia and the People's

Republic of China, and granting Respondent-Appellee Mongolia's cross-petition to confirm the award. Petitioners-Appellants further challenge the district court's rejection of their petition to compel arbitration on the merits. On appeal, Petitioners-Appellants' primary argument is that the district court erred by declining to review the arbitrability of their investment claims *de novo* before rejecting Petitioners-Appellants' petitions and confirming the arbitral award.

We reject the appeal and hold that Petitioners-Appellants were not entitled to *de novo* review of the arbitrability of their investment claims. While the bilateral investment treaty in this case does not contain a clear statement empowering arbitrators to decide issues of arbitrability, we hold that Petitioners-Appellants and Respondent-Appellee Mongolia (collectively, the "Parties") nonetheless "clear[ly] and unmistakabl[y]" agreed to submit questions of arbitrability to the arbitral tribunal in the course of the dispute between them. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (alterations and internal quotation marks omitted). First, the Parties reached an agreement at the outset of the arbitration, as confirmed by the arbitral tribunal in its first procedural order, providing that the tribunal would hear jurisdictional issues during a combined jurisdictional and liability phase. In doing so, the Parties agreed to submit issues of arbitrability to the arbitral tribunal in the first instance. Second, Petitioners-Appellants' conduct throughout the remainder of the arbitration further confirms, and in no way casts doubt on, their intent as expressed in that agreement to submit arbitrability issues to the arbitral tribunal. We therefore conclude that the district court properly declined to determine independently the arbitrability of Petitioners-Appellants' investment claims. We further conclude that in reaching their decision on arbitrability, the arbitrators did not exceed their powers, and thus agree with the district court's decision to confirm the award. Accordingly, we AFFIRM.

FOR PETITIONERS-APPELLANTS:     S. CHRISTOPHER PROVENZANO (Michael A. Granne, J.J. Gass, *on the brief*), Provenzano Granne & Bader LLP, New York, NY.

FOR RESPONDENT-APPELLEE:     MICHAEL NOLAN (Kamel Aitelaj, *on the brief*), Milbank LLP, Washington, D.C.

2

DEBRA ANN LIVINGSTON, *Chief Judge*:

Beijing Shougang Mining Investment Company, Ltd., China Heilongjiang International Economic & Technical Cooperative Corporation, and Qinhuangdaoshi Qinlong International Industrial Company Ltd. (collectively, "Petitioners-Appellants") filed a petition in the U.S. District Court for the Southern District of New York in September 2017 seeking to set aside an arbitral award (the "Award") resulting from an arbitration initiated by Petitioners-Appellants against Respondent-Appellee Mongolia ("Mongolia") under the 1991 bilateral investment treaty (the "Treaty") between Mongolia and the People's Republic of China (the "PRC"). [1] The subject of the arbitration was the alleged expropriation by Mongolia of certain investments made by Petitioners-Appellants prior to 2006 in an iron-ore mine located in a north-central province of Mongolia. After more than seven years of proceedings, an *ad hoc* arbitral tribunal constituted under the Treaty, and seated in New York, determined that it lacked jurisdiction over Petitioners-Appellants' claims of expropriation, bringing the arbitration to a close. Shortly thereafter, Petitioners-Appellants proceeded to the Southern District,

---

[1] *See* Agreement Between the Government of the People's Republic of China and the Government of the Mongolian People's Republic Concerning the Encouragement and Reciprocal Protection of Investments, Aug. 26, 1991.

3

where they petitioned the district court to set aside the Award and to compel a return to arbitration. On November 19, 2019, the district court (Ramos, *J.*) denied Petitioners-Appellants' petition to vacate the Award and motion to compel arbitration, and granted Mongolia's cross-petition to confirm the Award.

On appeal, Petitioners-Appellants argue that Mongolia and Petitioners-Appellants themselves (collectively, the "Parties") did not "clearly and unmistakably" agree to submit issues of "arbitrability" to arbitration and, therefore, that the district court erred by failing to conduct a *de novo* review of the arbitral tribunal's decision on arbitrability. They further argue that the arbitrators exceeded their powers and that the district court should not have confirmed the Award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. IV, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ("New York Convention"), and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 *et seq*.

For the reasons stated below, we disagree. The arbitral agreement at issue in this case—a bilateral investment treaty between Mongolia and the PRC—does not itself contain a clear statement empowering arbitrators to decide issues of arbitrability. Nonetheless, we hold that Petitioners-Appellants indisputably put

4

the issue of the arbitrability of their claims to the arbitral tribunal when they consented, along with Mongolia, to the arbitration proceeding in two phases, with a combined jurisdictional and liability phase and, if necessary, a quantum phase. In doing so, the Parties agreed to submit arguments as to the appropriate reach of the arbitrators' jurisdiction over Petitioners-Appellants' claims under the Treaty to the arbitral tribunal. The Parties reached such agreement, moreover, after it had already become clear that the key jurisdictional issue to be argued during the first phase was the scope of the arbitration clause provided in the Treaty, and whether that clause is limited to disputes about compensation, a question clearly implicating "arbitrability." Consequently, we hold that the record supplies "clear and unmistakable" evidence of the Parties' intent to arbitrate issues of arbitrability.

In light of this determination, we decline independent review of the arbitral tribunal's determination as to the appropriate interpretation of Article 8(3) of the Treaty, and instead review the Award with deference. We conclude that the arbitrators did not exceed their powers in construing the scope of the arbitral agreement, and thus that the Award is not subject to vacatur under the New York Convention or the FAA. We also find no error in the district court's decision to

5

deny Petitioners-Appellants' request to compel arbitration on the merits. Accordingly, we AFFIRM the order of the district court.

## BACKGROUND

### I.

In 1991, Mongolia (then known as the "Mongolian People's Republic") and the PRC concluded a bilateral investment agreement concerning "the encouragement and reciprocal protection of investments."[2]   J. App'x at 16.   This agreement provides certain guarantees for the investors of each country when making investments in the other, including fair and equitable treatment and most favorable treatment for investments, restrictions on expropriation, and guarantees for the cross-border transfer of investments.   Article 8 of the Treaty contains a dispute-resolution provision applicable to disputes between one of the sovereign states and investors from the other.   Specifically, Article 8(3) provides that "[i]f a dispute involving the amount of compensation for expropriation cannot be settled within six months after resort to negotiations . . . , it may be submitted at the request of either party to an ad hoc arbitral tribunal."   Treaty art. 8(3).

---

[2] We draw the following factual background from the Award.

Petitioners-Appellants are state-owned and private enterprises incorporated in the PRC. In 2002, Qinhuangdaoshi Qinlong International Industrial Company Ltd. ("Qinlong") formed a joint venture with a Mongolian partner to develop an iron-ore mine in north-central Mongolia. Beijing Shougang Mining Investment Company, Ltd. and China Heilongjiang International Economic & Technical Cooperative Corp. purchased equity in the joint venture from Qinlong in 2004, and the joint venture acquired the Mongolian partner's license to exploit iron ore at the mine in 2005.

Beginning in the early 2000s, Mongolia undertook a series of measures in relation to the joint venture's operations, ultimately leading to the revocation of the venture's extracting license in 2006. The joint venture thereafter sued in the Mongolian courts, appealing its case as far as the Supreme Court of Mongolia, where it ultimately lost. After a series of additional lawsuits against the Mongolian government, the license and land-use rights to the iron-ore deposit were granted to a Mongolian corporation.

In 2010, Petitioners-Appellants initiated arbitration against Mongolia under Article 8 of the Treaty, claiming that Mongolia had interfered with their investment in the mine, and that such interference amounted to expropriation. In

7

their request for arbitration, served on Mongolia in February 2010, Petitioners-Appellants set out their claims under the Treaty as well as under Mongolia's foreign investment law,[3] arguing that both sets of claims were subject to arbitral jurisdiction. In particular, Petitioners-Appellants maintained that jurisdiction under Article 8(3) was "not limited to an assessment of the compensation due for an expropriation," but instead, that the provision "g[ave] the Arbitral Tribunal jurisdiction to determine the existence of an expropriation under Article 4 of the Treaty and its lawfulness as well as any compensation due." J. App'x at 186. The Parties thereafter made their respective arbitrator appointments, and the International Centre for Settlement of Investment Disputes ("ICSID") appointed the president of the arbitral tribunal, in accordance with the procedures set out in the Treaty.

Shortly after the tribunal was constituted, the arbitrators called for a procedural meeting to discuss the organization of the arbitral proceedings. According to the terms of the Treaty, arbitrations under Article 8(3) are "*ad hoc*," meaning that no arbitral institution is selected for administration of the arbitration,

---

[3] Petitioners-Appellants later limited their claims to those under the Treaty, dropping their reliance on Mongolia's foreign investment law.

and that arrangements as to procedures must be made during the arbitration itself.[4] Counsel for the Parties were present at that meeting, which was held by the tribunal on October 1, 2010 in New York. On November 2, 2010, the tribunal issued its "Procedural Order No. 1," which set out a number of key provisions of the arbitration, as well as recounted key aspects of the first procedural meeting and agreements reached at it. The procedural order began by recounting that the "parties confirmed that the Tribunal had been properly constituted" under the Treaty. J. App'x at 195. The order then indicated that, in the absence of any language in the Treaty specifying the juridical seat of the arbitration, the seat of the arbitration would be New York, New York, a designation to which both Parties consented. J. App'x at 198.

With respect to the rules governing the arbitration, the procedural order further recounted that Article 8(5) of the Treaty "authorizes the Tribunal to determine its own procedure" and that, at the same time, "'the Tribunal may, in

---

[4] As a leading treatise explains, "[a]d hoc arbitrations are not conducted under the auspices or supervision of an arbitral institution. Instead, parties simply agree to arbitrate, without designating any institution to administer their arbitration." 1 Gary Born, *International Commercial Arbitration* 149 (2009). Nonetheless, the parties may select a preexisting set of procedural rules to govern the arbitration, such as the United Nations Commission on International Trade Law ("UNCITRAL") Arbitration Rules. *Id.* at 149-50.

9

the course of determination of procedure, take as guidance the [ICSID's] Arbitration Rules . . . .'" J. App'x at 199. In relation to the issue of procedures, Petitioners-Appellants proposed, but Mongolia did not agree, that the tribunal should adopt the revised United Nations Commission on International Trade Law ("UNCITRAL") Arbitration Rules to govern the proceedings. The tribunal resolved this disagreement by explaining that, "given the statement in the Treaty that the tribunal may, if it thinks it appropriate, refer to the ICSID Rules as guidance on questions of procedure," it "s[aw] no reason" to adopt a set of institutional rules at the outset of the proceedings. J. App'x at 199. Instead, the tribunal noted that it "expect[ed] that should it be called upon to rule on any procedural issue, the parties will bring to its attention such guidance from the ICSID Rules, the UNCITRAL Rules, or other authorities as they deem appropriate."[5] *Id.*

Finally, and most importantly in the context of the present dispute, the procedural order also set out key parameters for how the arbitration would proceed. With respect to written submissions to be made before the arbitral

---

[5] Procedural Order No. 1 also indicated that the Parties consented to appoint the Permanent Court of Arbitration as the administrator of the arbitral proceedings for purposes of assisting with the financial aspects of the arbitration proceedings, as well as with hosting hearings.

10

hearing, the tribunal recounted that "[t]he parties have agreed that the proceedings shall be divided into two phases, the first covering jurisdiction and liability, the second, if necessary, quantum." J. App'x at 199. The tribunal thereafter set out dates for the submission of briefs ("memorials") and exhibits prior to the first hearing.

The arbitration continued for seven years. In March 2011, Petitioners-Appellants submitted their memorial in which they invoked the jurisdiction of the tribunal under Article 8(3) of the Treaty and argued that, under their interpretation, the tribunal possessed jurisdiction over their claims. Specifically, they argued that Article 8(3) confers subject matter jurisdiction (referred to as jurisdiction "*ratione materiae*") "over disputes involving the existence and lawfulness of the expropriation of [their] investments, as well as the reparation to be granted to [them]." J. App'x at 231. Petitioners-Appellants further argued that a narrow reading of Article 8(3), requiring Petitioners-Appellants to first obtain a decision as to Mongolia's liability for the alleged expropriation from a national court or administrative tribunal before resorting to arbitration, is inconsistent with other features of Article 8, including a fork-in-the-road provision

11

in Article 8(3).   In their view, the tribunal must have jurisdiction to decide both whether an expropriation took place and the amount of any resulting reparations.

Mongolia took the opposite tack in its counter-memorial filed in September 2011, objecting to the tribunal's jurisdiction over Petitioners-Appellants' claims on the ground that, in its view, Article 8(3) confers jurisdiction only over disputes about the "quantum of compensation for expropriation" after an expropriation has been determined outside of arbitration.[6]   J. App'x 406.   Petitioners-Appellants filed a reply memorial in June 2012, responding to Mongolia's jurisdictional objections and reiterating its argument as to the scope of Article 8(3), while Mongolia filed a rejoinder in December 2012.

In September 2015, the tribunal held hearings at the Permanent Court of Arbitration in The Hague, Netherlands.[7]   On June 30, 2017, the tribunal rendered

---

[6] Mongolia further argued, *inter alia*, that the tribunal lacked jurisdiction because, in its view, Petitioners-Appellants' investment was procured by theft, embezzlement, and fraud, Petitioners-Appellants' claims amounted to an "impermissible appeal" of Mongolian judicial decisions finding corruption and fraud, J. App'x at 400, the investment at issue did not incur a "real investment risk" and therefore fell outside the protection of the Treaty, J. App'x at 419, and Petitioners-Appellants had already availed themselves of judicial resolution in Mongolian courts.   Mongolia also made counterclaims against Petitioners-Appellants relating to these issues.

[7] As discussed in Part I.B, the tribunal also issued its "Procedural Order No. 5" on October 6, 2012.   In this order, the tribunal recounted that Petitioners-Appellants

its award in New York. The tribunal held that it lacked subject matter jurisdiction under the Treaty to entertain Petitioners-Appellants' claims. Award at 140-148, 152. The tribunal began its reasoning by observing that the entirety of its jurisdiction was founded on Article 8(3), which conferred jurisdiction over "dispute[s] involving the amount of compensation for expropriation." *Id.* at 143. Looking to the ordinary meaning of that clause and its place within the Treaty, the tribunal concluded that Article 8 did not require Mongolia to arbitrate the issue of whether an expropriation had occurred, but only the amount of compensation due. In its view, the clause "dispute involving the amount of compensation for expropriation" limits the jurisdiction of an arbitral tribunal to disputes over whether compensation owed "is equivalent to the value of the expropriated investments at the time when expropriation is proclaimed." *Id.* at 145. In other words, arbitral jurisdiction extends only to "cases where an expropriation has been formally proclaimed" and the amount to be paid is disputed. *Id.* at 146.

---

submitted a letter to the tribunal on August 31, 2012, toward the close of briefing, requesting that the tribunal "remind the parties that any award rendered by the Tribunal is final and binding and that the parties should not, directly or indirectly, take any steps that may undermine or affect the enforceability of the award." Mem. of Law in Opp'n to (1) Pet'rs' Pet. to Vacate Arbitral Award & (2) In Supp. of Resp'ts' Cross-Pet. to Confirm Arbitration Award, Attach. 8. The tribunal ultimately declined to issue such a "reminder" on the basis that Petitioners-Appellants had not presented the tribunal with a specific dispute or issue requiring it to do so. *Id.*

The tribunal therefore held that it lacked jurisdiction over Petitioners-Appellants' claims in the absence of any documentation from a Mongolian court or other administrative body that an expropriation had occurred. The arbitration thus reached its end.

**II.**

On September 28, 2017, Petitioners-Appellants filed a petition in the U.S. District Court for the Southern District of New York seeking to set aside the Award, *see* 9 U.S.C. § 10(a)(4) (providing that a federal court may vacate an arbitral award "where the arbitrators exceeded their powers"), and compel arbitration of the merits of the dispute, *see id.* § 4. Mongolia opposed the petition and cross-petitioned to confirm the Award. *See id.* §§ 204, 207 (providing that a party may move "for an order confirming [an arbitral] award," *id.* § 207, in a federal court of the "place designated in the agreement as the place of arbitration if such place is within the United States," *id.* § 204); New York Convention art. IV (providing that a party may apply "for recognition and enforcement" of an arbitral award subject to the Convention). Petitioners-Appellants' main argument was that the district court should review the arbitral tribunal's decision as to jurisdiction *de novo* "[b]ecause the Treaty does not explicitly assign the question of arbitrability to the

14

Tribunal." Pet. to Vacate Arbitral Award Declining to Exercise Arbitral Jurisdiction and Compel Arbitration, at 2. In their view, "unless the relevant arbitration agreement . . . clearly and unmistakably commits the question of an arbitral tribunal's jurisdiction to that tribunal, the arbitrability of a claim is a matter of law for a court to determine independently, without deference to the arbitrators' decision." *Id.* Petitioners-Appellants further argued that upon review of the tribunal's decision on jurisdiction, the court should vacate the Award because the arbitrators arrived at an incorrect interpretation of the scope of Article 8(3) of the Treaty. They maintained that the tribunal's interpretation was "an extremely narrow construction" of Article 8(3) of the Treaty that "defeats the purpose of investor-state arbitration." *Id.* at 10.

Mongolia responded that the dispute over Article 8(3) did not concern a question of arbitrability mandating *de novo* review and that, in the alternative, the Parties agreed to submit the issue to the arbitrators. Mongolia pointed to Petitioners-Appellants' submissions before the tribunal arguing for their preferred interpretation of Article 8(3), as well as Petitioners-Appellants' failure to argue during the arbitration that the tribunal lacked the competence to determine its own jurisdiction. Mongolia concluded that because Petitioners-Appellants also did

15

not meet their burden of proving that the Award should be vacated under the New York Convention or the FAA, the district court should confirm the Award.

On November 19, 2019, the district court (Ramos, *J.*) denied Petitioners-Appellants' petition to vacate the Award and motion to compel arbitration, and granted Mongolia's cross-petition to confirm the Award. In explaining its decision not to review the Award's decision on jurisdiction *de novo*, the district court reasoned that "the treaty itself does not contain clear and unmistakable evidence that the parties intended to place the question of arbitrability before the arbitrators," particularly because it does not designate arbitral rules to govern the arbitration that suggest arbitrators have the power to rule on objections that they have no jurisdiction. Sp. App'x at 6. Nonetheless, the district court explained that "the [Petitioners-Appellants'] behavior during the arbitration d[id]" provide "clear and unmistakable" evidence of Petitioners-Appellants' intent to arbitrate issues of arbitrability. *Id.* As the district court recognized, Petitioners-Appellants "initiated the arbitration and argued for the arbitrators' jurisdiction from their very first submission." *Id.* at 8. On that basis, the district court held that Petitioners-Appellants were not entitled to independent review of the Award.

16

Proceeding to deferential review, the district court confirmed the Award. Construing Petitioners-Appellants' arguments concerning the accuracy of the arbitrators' interpretation of Article 8(3) as a petition to vacate the award under § 10(a)(4) of the FAA, the district court concluded that Petitioners-Appellants had not met their burden to show that the arbitrators "exceeded their powers." *Id.* at 10. This appeal followed.

**DISCUSSION**

Petitioners-Appellants argue that the district court erred by failing to independently review the arbitral tribunal's decision on jurisdiction before rejecting their petitions and confirming the Award. Mongolia, for its part, contends that the district court properly engaged in deferential review of the Award. For the reasons stated below, we reject Petitioners-Appellants' arguments. We agree with the district court that the Treaty in this case does not supply "clear and unmistakable" evidence that the Parties intended to submit arbitrability issues to arbitration. Nonetheless, we find that the Parties "clearly and unmistakably" expressed their intent to submit issues of arbitrability to arbitration. The Parties agreed at the outset of the arbitration that the tribunal would hear jurisdictional issues in the first phase of the arbitration, after it had

become clear that the key jurisdictional issue to be argued was the scope of the Treaty's arbitration clause, a question clearly implicating "arbitrability." This agreement "clearly and unmistakably" evidences the Parties' intent. Petitioners-Appellants' conduct during the remainder of the arbitration, moreover, confirms their intent as expressed in that agreement, and in no way casts doubt on it. We therefore review the Award with deference and affirm the district court's decision to confirm the Award, as well as its denial of Petitioners-Appellants' request to compel arbitration on the merits.

## I.

We begin with the question of whether the district court was required to independently review the tribunal's determination of the arbitrability of the dispute as expressed in the Award. We evaluate the district court's decision on this issue *de novo*. *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012).[8]

## A.

"The question [of] whether the parties have submitted a particular dispute to arbitration, *i.e.*, the question of arbitrability, is an issue for judicial determination

---

[8] We have jurisdiction over this matter pursuant to 28 U.S.C. § 1291.

unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (internal quotation marks, emphasis, and alteration omitted); *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 296 (2010). The concept of "arbitrability" "include[s] questions such as 'whether the parties are bound by a given arbitration clause,' or 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'" *BG Grp. PLC v. Republic of Argentina*, 572 U.S. 25, 34 (2014) (quoting *Howsam*, 537 U.S. at 84)); *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 651 (1986) (holding that it was for the court to decide whether a particular labor dispute fell within the arbitration clause of a collective-bargaining agreement); *Schneider*, 688 F.3d at 71 ("'Question[] of arbitrability' is a term of art covering 'dispute[s] about whether the parties are bound by a given arbitration clause' [*i.e.*, formation] as well as 'disagreement[s] about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy' [*i.e.*, scope]." (quoting *Republic of Ecuador v. Chevron Corp*, 638 F.3d 384, 393 (2d Cir. 2011) (alterations in original))).[9]

---

[9] For purposes of clarity, and in response to confusion revealed in the briefing, we note that the definition of "arbitrability" in our case law differs from that of some foreign jurisdictions, where "arbitrability" may refer to whether an issue is permitted by law to be resolved by arbitration, notwithstanding the agreement of the parties. *See* 1 Born,

At the start, Petitioners-Appellants maintain that the question of whether Article 8(3) of the Treaty provides jurisdiction over their claims constitutes a dispute about "arbitrability." Mongolia, on the other hand, objects that the dispute over jurisdiction addressed by the tribunal was not in fact a dispute about "arbitrability," as the Parties had already consented to arbitration under the Treaty, and that in any case, the matter was put to the arbitrators.

We agree with Petitioners-Appellants that the issue of whether Article 8(3) of the Treaty reaches Petitioners-Appellants' claims for expropriation does in fact constitute a dispute about "arbitrability." In this case, the core dispute between the Parties, and on which the tribunal concluded that it lacked jurisdiction over Petitioners-Appellants' claims, concerns the appropriate reading of the language "dispute[s] involving the amount of compensation for expropriation," and in particular, whether that clause provides arbitral jurisdiction over only disputes about the amount of compensation rather than whether compensation is owed. As Petitioners-Appellants' claims are not viable unless they fall within this clause, this issue undoubtedly concerns arbitrability. *Schneider*, 688 F.3d at 71

---

*International Commercial Arbitration*, at 766-68 (suggesting that in certain foreign jurisdictions, disputes involving criminal matters and domestic relations subjects are often deemed "nonarbitrable").

20

(explaining that the concept of "arbitrability" includes "disagreements about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy" (internal quotation marks and alterations omitted)). Under our case law, the district court was therefore required to review the tribunal's decision *de novo* unless the record supplies "clear and unmistakable evidence" that the Parties agreed to submit the issue to arbitration. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (internal quotation marks and alterations omitted); *see also BG Grp.*, 572 U.S. at 34 ("[C]ourts presume that the parties intend courts, not arbitrators, to decide . . . disputes about 'arbitrability.'").

Unlike several of our prior cases, as the district court recognized, the arbitral agreement at issue in this case—a bilateral investment treaty—does not itself contain a clear statement empowering arbitrators to decide issues of arbitrability. We have previously concluded that where "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, th[at] incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Sol. Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005). For example, in *Republic of Ecuador* we held that a bilateral investment treaty's incorporation of the UNCITRAL Rules supplied "clear and unmistakable

21

evidence" that the parties intended questions of arbitrability to be decided by the arbitral panel. 638 F.3d at 394 (relying on UNCITRAL Article 21, which states that the arbitrator "shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the . . . arbitration agreement" (quoting UNCITRAL Arbitration Rules art. 21, ¶ 1, G.A. Res. 31/98, U.N. Doc. A/RES/31/98 (Dec. 15, 1976)); *see also Schneider*, 688 F.3d at 72–73 (same). In this case, however, the Treaty did not adopt such arbitral rules (as it instead called for "*ad hoc*" arbitration), and no other clause appears to commit the issue of arbitrability to the arbitrators. Consequently, because the question of arbitrability is not subject to our presumption in favor of arbitration, we cannot assume that the Parties intended to leave the issue to arbitration.

Nonetheless, we find "clear and unmistakable" evidence of intent to submit issues of arbitrability to arbitration in another location: an agreement reached by the Parties at the outset of the arbitration. As recounted above, at the start of the arbitral process, the Parties met and conferred on several procedural aspects of the arbitration. In doing so, as reported in Procedural Order No. 1, the Parties agreed that the first phase of the arbitration would cover jurisdictional and liability disputes. We now hold that this agreement was sufficient in the context of the

present arbitration to evidence the Parties' intent to submit arbitrability issues to arbitration.

In explaining our decision, we first emphasize the fact that the Parties made this agreement with respect to jurisdictional arguments *after* it had already become clear that the key jurisdictional issue in dispute was the proper interpretation of Article 8(3) of the Treaty, an arbitrability issue. *Cf. First Options*, 514 U.S. at 945 (explaining that a concern animating the presumption in favor of judicial review is the fact that "[a] party often might *not* focus upon [the "who should decide arbitrability"] question or upon the significance of having arbitrators decide the scope of their own powers" (emphasis added)). For example, in Petitioners-Appellants' Request for Arbitration served on Mongolia nearly nine months prior to the first procedural meeting, Petitioners-Appellants argued that the "true interpretation" of Article 8 provides that jurisdiction of the arbitral tribunal is not "limited to an assessment of the compensation due for an expropriation," and that "[a]ny other interpretation would render the standard of protection under the Treaty purely formal and would thus defeat the purpose of the Treaty." Request for Arbitration ¶¶ 68–69. Considered in this context, we have little doubt then that in agreeing that the tribunal would hear jurisdictional issues, Petitioners-

Appellants knew that they were submitting the key issue of arbitrability to resolution by the tribunal. Moreover, as we have previously explained, the fact that the Parties to the arbitration are not the same "parties" as those who signed the bilateral investment treaty is immaterial, given that bilateral investment treaties "merely create[] a framework through which foreign investors . . . can initiate arbitration against parties to the Treaty." *Republic of Ecuador*, 638 F.3d at 392 (explaining that a bilateral investment agreement is an agreement between two sovereign states that in effect constitutes a unilateral standing offer to submit to arbitration with investors of the other sovereign when certain conditions are met); *see also BG Grp.*, 572 U.S. at 53 (Roberts, *C.J.*, dissenting). Mongolia, "'by signing the [1991 Treaty], and [Petitioners-Appellants], by consenting to arbitration, have created a separate binding agreement to arbitrate.'" *Schneider*, 688 F.3d at 71 (quoting *Republic of Ecuador*, 638 F.3d at 392).

Second, we discern no reason to conclude that evidence of intent to submit arbitrability issues to arbitration may be found only in arbitral agreements, and not in subsequent agreements reached by parties during an arbitration. While we have previously stated that "the issue of arbitrability may only be referred to the arbitrator if 'there is clear and unmistakable evidence from the *arbitration*

24

*agreement*, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator,'" *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (quoting *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) (internal quotation marks and emphasis omitted) (emphasis added)), we have previously relied, at least in part, on an agreement reached during an arbitration as evidence of intent to submit arbitrability issues to arbitration. In *Schneider*, we found that an investor and sovereign state had clearly and unmistakably agreed to arbitrate questions of arbitrability where the parties signed, after the tribunal was constituted, "Terms of Reference" empowering the tribunal to "consider . . . objections to jurisdiction." 688 F.3d at 70. While in that case we had the benefit of relying on both those Terms of Reference and the bilateral investment treaty's adoption of the UNCITRAL arbitral rules, we "consider[ed] both . . . the agreed Terms of Reference and the incorporation of Article 21 of the UNCITRAL rules," in arriving at our conclusion as to arbitrability. *Id.* at 73.

We have also previously accepted adoptions of procedures by one party during the course of arbitration as evidence of intent with respect to arbitrability, particularly where the relevant treaty explicitly delegated the decision as to the

25

applicable arbitral rules to that party. *See Republic of Ecuador*, 638 F.3d at 395 (finding that Chevron "consented to sending . . . threshold issues to the arbitrator" where the U.S.-Ecuador bilateral investment treaty provided that an investor initiating arbitration could choose, as one option, to submit the dispute for settlement by binding arbitration under the UNCITRAL rules, and Chevron invoked those rules in its notice of arbitration); *cf. Howsam*, 537 U.S. at 82 (relying on the fact that the party initiating arbitration was entitled under the arbitral agreement to select the arbitration forum, and the relevant party chose National Association of Securities Dealers ("NASD") arbitration by signing an agreement with the NASD that submitted the matter to arbitration in accordance with NASD rules). In this case, the Treaty in effect delegated certain questions about arbitrability to both Parties when it called for "*ad hoc*" arbitration,[10] the terms of

---

[10] In this case, while the Treaty does not expressly adopt rules dealing with arbitrability, Article 8(5) of the Treaty indicates that "[t]he tribunal shall determine its own procedure," and that "the tribunal may, in the course of determination of procedure, take as guidance the [ICSID] Arbitration Rules . . . ." Treaty art. 8(5). The 1984 version of those rules, which were operative at the time the Treaty was concluded, provide that an arbitral tribunal is to decide objections to whether a dispute is within its jurisdiction raised by the parties, and that, further, a tribunal "may on its own initiative consider . . . whether the dispute or any ancillary claims before it is within the jurisdiction of the Centre and within its own competence." International Centre for Settlement of Investment Disputes, Rules of Procedure for Arbitration Proceedings, Rule 41 (1984). Accordingly, the Treaty in no way forecloses the possibility of the Parties sending arbitrability issues to the arbitrators, and references as a possible source of guidance rules

which would need to be worked out by them.

Petitioners-Appellants nonetheless object that even if they argued arbitrability issues to the arbitrators, *de novo* review is still required because they did not give the tribunal "primary power" over arbitrability issues. In making this argument, Petitioners-Appellants attempt to draw a distinction between intending to submit arbitrability issues to arbitration and intending to submit arbitrability issues to arbitration *without the possibility of independent judicial review*. We have, however, previously rejected this argument. In *Republic of Ecuador*, we found "clear and unmistakable" evidence of intent to arbitrate arbitrability issues where the relevant treaty adopted UNCITRAL Article 21, which provides that the arbitrator "shall have the power to rule on objections that it has no jurisdiction." 638 F.3d at 394. As we explained, these rules clearly indicate that arbitrability issues are to be "decided by the arbitral panel in the first instance." *Id.* Then in *Schneider*, we rejected Thailand's suggestion that our language "in the first instance" somehow suggested that the "arbitrators [had the] power to decide their jurisdiction at the outset of the arbitration without delay," but that adoption of

that expressly provide for such an approach.

27

such rules did not "preclude[] independent judicial review at the later confirmation stage." 688 F.3d at 73. We concluded that "[o]nce the parties have agreed that an arbitrator may decide questions regarding the scope of arbitrable issues in the first instance," federal courts are indeed required to afford deference to the arbitral tribunal's decision as to that scope. *Id.*; *see also id.* at 74 (explaining that adoption of the UNCITRAL Rules "necessarily means that a district court considering whether to confirm the award must review the arbitrators' resolution of such questions with deference").

Along similar lines, the fact that the Parties in this case agreed that the arbitrators would hear "jurisdictional" arguments, but did not expressly state that the arbitrators "have the power to" rule on jurisdictional issues, does not change our analysis. While we have often relied on arbitral rules with language of the latter sort, *see, e.g.*, *Contec Corp.*, 398 F.3d at 208 (relying on Rule 7 of the American Arbitration Association ("AAA") Rules, stating that with respect to jurisdiction "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement"); *Schneider*, 688 F.3d at 72-73 (relying on similar language in UNCITRAL Article 21); *All. Bernstein Inv. Rsch. & Mgmt.*, 445 F.3d 121, 127 (2d

28

Cir. 2006) (relying on NASD Code Rule 10324, which provides that "[t]he arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code . . . . Such interpretations . . . shall be final and binding upon the parties"), this phrasing is hardly mandatory. For example, we have previously cited language in the International Chamber of Commerce Rules as evidence of the parties' clear and unmistakable intent to submit the issue of arbitrability to the arbitrators, where the relevant language in those rules suggests that an arbitral tribunal "may decide" issues of jurisdiction raised by the parties.[11] *Shaw Grp.*, 322 F.3d at 122. Similarly, in *Schneider*, we explained that language in the parties' Terms of Reference indicating that "'[t]he Tribunal may consider . . . objections to jurisdiction' . . . [wa]s entirely consistent with and parallel to the language in Article 21" of the UNCITRAL Arbitration Rules, 688 F.3d at 73, even though the language of those rules provided that "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement," UNCITRAL Arbitration Rules art. 21, ¶ 1, G.A. Res. 31/98,

---

[11] *See* International Chamber of Commerce, Arbitration Rules, Rule 6.2 (1998) (since revised on 1 Jan. 2021).

U.N. Doc. A/RES/31/98 (Dec. 15, 1976); *see also Schneider*, 688 F.3d at 73–74 (relying on the parties' adoption of both the UNCITRAL Rules and the Terms of Reference as evidence of intent and referring to the language in the Terms of Reference as "substantially similar" to the language of the UNCITRAL Rules, *id.* at 74).

Accordingly, we conclude that the Parties "clearly and unmistakably" evidenced their intent to submit arbitrability issues to arbitration where they agreed to submit jurisdictional issues to the arbitrator during the first phase of the arbitration.

**B.**

Our conclusion that Petitioners-Appellants "clearly and unmistakably" intended to submit issues of arbitrability to the arbitrators is only reinforced by consideration of their conduct during the arbitration. *See Republic of Ecuador*, 638 F.3d at 395 (noting that in addition to invoking the UNCITRAL Rules, Chevron "argued that questions of arbitrability are for the arbitral panel"). In this case, after agreeing that the arbitrators would hear jurisdictional arguments, Petitioners-Appellants proceeded to affirmatively argue their case for the tribunal's jurisdiction over their claims both in their written memorial and at the hearing. *See* Claimants' Memorial (Mar. 1, 2011) at 16–25 (analyzing competing

interpretations of the scope of Article 8(3) and arguing that the tribunal should adopt their reading and "assume jurisdiction over the[ir] claim for expropriation," *id.* at 25).[12]   Petitioners-Appellants also submitted a letter to the tribunal on August 31, 2012, towards the close of briefing, requesting that the tribunal issue an order specifically for the purpose of "remind[ing] the parties that any award rendered by the Tribunal is *final* and binding and that the parties should not, directly or indirectly, take any steps that may undermine or affect the enforceability of the award," which strongly belies their argument on appeal that they did not believe that the tribunal had authority to conclusively determine jurisdictional issues.   Mem. of Law in Opp'n to (1) Pet'rs' Pet. to Vacate Arbitral Award & (2) In Supp. of Resp'ts' Cross-Pet. to Confirm Arbitration Award, Attach. 8 at 2 ("Procedural Order No. 5") (emphasis added).   Moreover, at no point in the arbitration did Petitioners-Appellants object to the arbitrators resolving arbitrability issues.

As such, we find nothing in Petitioners-Appellants' conduct during the arbitration that runs counter to our conclusion that Petitioners-Appellants

---

[12] Moreover, contrary to Petitioners-Appellants' claim, considerably before the Parties submitted these jurisdictional arguments, New York was selected as the seat of the arbitration, putting the Parties on notice as to New York and federal arbitration law.

31

intended to submit arbitrability issues to arbitration, as evidenced by their agreement with respect to jurisdictional issues. Instead, such conduct reinforces our conclusion. We therefore affirm the district court's decision declining *de novo* review of the Award.

## II.

Having determined that independent review of the Award is not warranted, we review the Award only with deference. *See BG Grp.*, 572 U.S. at 33, 41; *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000) (explaining that where parties send a matter to arbitration, "courts will set aside the arbitrator's interpretation of what [an] agreement means only in rare instances"); *Schneider*, 688 F.3d at 73–74 (explaining that where there is clear and unmistakable evidence of intent to arbitrate arbitrability issues, "[t]his necessarily means that a district court considering whether to confirm the award must review the arbitrators' resolution of such questions with deference"). We hold that the district court did not abuse its discretion in concluding that Petitioners-Appellants failed to meet their burden with respect to vacatur under the FAA or the New York Convention. We further reject Petitioners-Appellants' challenge that the district court was required to compel arbitration on the merits.

32

**A.**

On appeal from an order by the district court confirming an arbitral award, we review legal conclusions and interpretations *de novo*, and findings of fact for clear error. *See VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 325 (2d Cir. 2013). As the law applicable to review of arbitral awards with foreign connections has proven prone to confusion,[13] we begin with a short explanation of the law relevant to the district court's review.

1.

Our starting point with respect to the confirmation of investor-state arbitral awards is the New York Convention, which applies to "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought," as well as to "arbitral awards *not considered as domestic* awards in the State where their recognition and enforcement are sought." New York Convention art. 1(1) (emphasis added). While the Convention does not define awards "not considered as domestic," *see Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2d

---

[13] *See CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 75 (2d Cir. 2017) (encouraging courts to "take care to specify explicitly the type of arbitral award the district court is evaluating," namely whether an award is "foreign," "nondomestic," or "domestic," and their jurisdictional posture in reviewing the award); *see infra* note 15.

Cir. 1983) (explaining that "[t]he definition appears to have been left out deliberately in order to cover as wide a variety of eligible awards as possible, while permitting the enforcing authority to supply its own definition of 'nondomestic' in conformity with its own national law"), this Circuit has adopted a "broad[] construction" of that language, *id.* As we explained in *Bergesen*, for purposes of the reach of the Convention in our courts, awards "not considered as domestic" denotes awards that are subject to the Convention not because they were "made abroad," but because they are "made within the legal framework of another country." *Id.*; *see CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 70 (2d Cir. 2017) (explaining that for purposes of the New York Convention, an award is "'made' in the country of the 'arbitral seat,'" which is "'the jurisdiction designated by the parties or by an entity empowered to do so on their behalf to be the juridical home of the arbitration'" (quoting Restatement (Third) of the U.S. Law of International Commercial and Investor-State Arbitration § 1-1 (Am. L. Inst. 2012)). Such "nondomestic" awards include those that are "pronounced in accordance with foreign law or [which] involv[e] parties domiciled or having their principal place of business outside the enforcing jurisdiction." *Bergesen*, 710 F.2d

34

at 932.[14]    Accordingly, as we have summarized, the New York Convention applies to three types of arbitral awards: (1) "arbitral awards 'made' in a foreign country that a party seeks to enforce in the United States (known as foreign arbitral awards)"; (2) "arbitral awards 'made' in the United States that a party seeks to enforce in a different country"; and (3) "nondomestic arbitral awards that a party seeks to enforce in the United States," where such awards are "nondomestic" on account of their connections with a foreign legal framework.    *CBF*, 850 F.3d at 70; *see also id.* at 73.

The present case involves an arbitral award of the third type.    Though the Parties agreed to seat the arbitration in New York, New York in the absence of a designated seat for the arbitration in the Treaty, the Award at issue qualifies as "nondomestic" as Petitioners-Appellants are all non-U.S. citizens disputing with a foreign sovereign over investments made in the territory of that foreign

---

[14] In light of Chapter 2 of the FAA, 9 U.S.C. § 201 *et seq.*, which implements the New York Convention, arbitral awards thus "fall[] under the [New York] Convention," 9 U.S.C. § 202, "*unless* both parties are citizens of the United States *and*" the legal relationship giving rise to the arbitration "'involves [neither] property located abroad, [nor] envisages performance or enforcement abroad, [n]or has some other reasonable relation with one or more foreign states,'" *CBF*, 850 F.3d at 71 (quoting 9 U.S.C. § 202) (emphases and alterations in original)); *see also Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 19 (2d Cir. 1997).

sovereign.    *See Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 19 (2d Cir. 1997).

Application of the New York Convention does not, however, limit the application of the FAA in the present case.    *Id.* at 20.    To the contrary, while Article V of the New York Convention provides "the exclusive grounds for refusing confirmation under the Convention," we have previously explained that "one of those exclusive grounds is where '[t]he award . . . has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.'"    *Id.* (quoting New York Convention art. V(1)(e)). The inclusion of this grounds means that "the state in which, or under the law of which, [an] award is made, [is] free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief."    *Id.* at 23.    Consequently, because the Parties elected to seat the arbitration in New York, the "available grounds for vacatur include all the express grounds for vacating an award under the FAA."    *Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 588 (2d Cir. 2016).[15]

---

[15] We have previously referred to federal courts sitting in this posture—reviewing a request under the New York Convention for confirmation or vacatur of a nondomestic award rendered in the United States—as exercising "primary jurisdiction," as compared to "secondary jurisdiction."    *CBF*, 850 F.3d at 71.    We have used the latter term to refer

2.

Having recounted the law applicable to petitions to confirm or set aside the Award in this case, we proceed to the merits of Petitioners-Appellants' claims for vacatur. We reach our conclusion in short order.

"The confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Toys "R" Us*, 126 F.3d at 23 (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984) (alterations omitted)). "The review of arbitration awards is 'very limited . . . in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.'" *Id.* (quoting *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993)). Moreover, petitioners "must clear a high hurdle" to successfully contend that the decision of an arbitral tribunal must be vacated. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).

---

to the situation where courts are asked to enforce an award rendered abroad, meaning that, in accordance with the New York Convention, they may refuse enforcement only on the limited grounds specified in Article V. *Id.* To be certain, then, in this case the district court exercised "primary jurisdiction" over the Award on account of the Parties having elected to seat the arbitration in New York. *Id.* at 73.

In this case, as the district court recognized, Petitioners-Appellants did not clearly indicate in their filings below any provision of the FAA or the New York Convention providing grounds to grant vacatur of the Award. They also did not reply with any specificity to Mongolia's arguments against vacatur under the FAA. Accordingly, the district court would have been on firm ground had it rejected Petitioners-Appellants' arguments on this basis. *See Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997) (explaining that a party seeking to avoid summary confirmation of an arbitral award and seeking vacatur has the burden of proof). Nonetheless, because the district court construed Petitioners-Appellants' arguments as a petition to vacate the Award on the ground that the Award resulted from an excess of arbitral power, s*ee* 9 U.S.C. § 10(a)(4), we review its analysis of that issue. We agree that Petitioners-Appellants have not met their burden of showing that vacatur is warranted on this ground.

Under Section 10(a)(4) of the FAA, an arbitral decision may be vacated where the "arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). In our case law, "[w]e have consistently accorded

38

the narrowest of readings to the [FAA's] authorization to vacate awards pursuant to § 10(a)(4)." *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 220 (2d Cir. 2002) (quoting *In re Andros Campania Maritima, S.A.*, 579 F.2d 691, 703 (2d Cir. 1978) (alterations omitted)). Our analysis under Section 10(a)(4) therefore "focuses on whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *Id.* (quoting *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 824 (2d Cir. 1997)); *see also In re Fahnestock & Co., Inc.*, 935 F.2d 512, 515 (2d Cir. 1991). Indeed, only where an arbitrator "'act[s] outside the scope of his contractually delegated authority'—issuing an award that 'simply reflect[s] [his] own notions of [economic] justice' rather than 'draw[ing] its essence from the contract'—may a court overturn his determination." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013) (quoting *E. Associated Coal Corp.*, 531 U.S. at 62).

As established in Part I of this opinion, the Parties "clearly and unmistakably" submitted the issue of the scope of the arbitrators' jurisdiction under Article 8(3) of the Treaty to the tribunal. Therefore, "the sole question for us is whether the arbitrator[s] (even arguably) interpreted the parties' contract, not

whether [they] got its meaning right or wrong." *Id*. Here, the tribunal's determination that it lacked jurisdiction under a reasonable reading of Article 8(3) fell well within its interpretative authority. *Cf. BG Grp.*, 572 U.S. at 44 (finding that the arbitration panel's determination that a local litigation requirement did not impede arbitration fell "well within the arbitrators' interpretive authority"). The tribunal's reasoning also drew "its essence from the agreement to arbitrate," *see ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co.*, 564 F.3d 81, 85 (2d Cir. 2009), as indeed the arbitrators looked closely at the text of the Treaty in arriving at their decision, in line with customary approaches to treaty interpretation, while distinguishing competing interpretations in their analysis. As such, even if we would not necessarily reach the same interpretation,[16] any difference in opinion is not enough to conclude that the arbitrators "stray[ed] from interpretation and application of the agreement and effectively dispense[d] [their] own brand of . . . justice." *Stolt-Nielsen, S.A.*, 559 U.S. at 671 (internal quotation marks and alterations omitted); *BG Grp.*, 572 U.S. at 45.

---

[16] In reaching our decision, we do not express an opinion on the correctness of the arbitral tribunal's decision on jurisdiction. *See Banco de Seguros del Estado v. Mut. Marine Off., Inc.*, 344 F.3d 255, 262 (2d Cir. 2003) (cautioning that when reviewing arbitral awards under the FAA, courts are not to determine whether the arbitrators "correctly" decided issues put to them (quoting *DiRussa*, 121 F.3d at 824)).

We are also not persuaded that the tribunal's decision not to exercise jurisdiction somehow merits a different analysis. As we have previously recognized, the fact that there is a "sufficient relationship" between the parties and "the rights created under [an] agreement" to justify the initiation of arbitration by no means precludes an arbitrator from later deciding, in the course of that arbitration, "that the dispute itself [is] not arbitrable." *Republic of Ecuador*, 638 F.3d at 395 (internal quotation marks and alterations omitted).

We therefore find no evidence that the arbitrators "exceeded their powers" and affirm the district court's confirmation of the Award. 9 U.S.C. § 10(a)(4).

**B.**

Finally, we reject Petitioners-Appellants' challenge to the district court's denial of their motion to compel arbitration under Section 4 of the FAA. 9 U.S.C. § 4. We review the district court's decision on this issue *de novo*. *See LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 198 (2d Cir. 2004).

In deciding a motion to compel arbitration,[17] "the role of courts is limited to determining two issues: i) whether a valid agreement or obligation to arbitrate

---

[17] Section 4 of the FAA provides in relevant part:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district

41

exists, and ii) whether one party to the agreement has failed, neglected or refused to arbitrate." *Id.* (quoting *Jacobs v. U.S.A. Track & Field*, 374 F.3d 85, 88 (2d Cir. 2004)). "A party has refused to arbitrate if it 'commences litigation or is ordered to arbitrate th[e] dispute [by the relevant arbitral authority] and fails to do so.'" *Id.* (quoting *Jacobs*, 374 F.3d at 89 (alteration in original)). Once a party petitions to compel arbitration, "[t]he court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

Applying these principles, Petitioners-Appellants have no claim under Section 4 of the FAA to compel arbitration. Mongolia neither commenced litigation in lieu of arbitration, nor refused to comply with an order to arbitrate the dispute issued by the arbitrators. *See Jacobs*, 374 F.3d at 89. Mongolia instead answered the arbitral demand, here styled as a "request for arbitration," duly appointed its arbitrator, participated in the selection of the president of the arbitral

---

court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4.

tribunal, was present at meetings to decide the procedures and organization of the arbitration, fully pursued its defense, and complied with the demands of the tribunal. *See LAIF X*, 390 F.3d at 199. Moreover, Mongolia's challenge to the arbitrability of Petitioners-Appellants' claims before the tribunal, *i.e.*, its argument that the tribunal lacked jurisdiction under Article 8(3), in no way constituted a refusal to arbitrate such that Petitioners-Appellants accrued a claim under Section 4 of the FAA for the district court to compel arbitration. *See Jacobs*, 374 F.3d at 89 ("The fact that respondents raised before the AAA an objection to petitioner's Demand for Arbitration . . . does not constitute a 'refusal to arbitrate' on the part of respondents."). Accordingly, we find no basis on which to accept Petitioners-Appellants' contentions and we affirm the district court's denial of their petition to compel arbitration.

\* \* \*

In the absence of "clear and unmistakable" evidence that the parties to an arbitration have agreed to allow arbitrators to decide arbitrability issues, district courts are required to independently review those issues. Owing to preferences for efficiency, or the specialized expertise of arbitrators, parties may nonetheless decide to reverse this presumption and submit arbitrability issues to the

determination of arbitrators. We affirm today that in the context of bilateral investment treaty arbitration, courts may find evidence of parties' intent to submit arbitrability issues to arbitration in subsequent agreements reached by parties during the course of an arbitration.

## CONCLUSION

For the foregoing reasons, we AFFIRM the order of the district court.